**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRILOGY FEDERAL, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>CIVITASDX LLC, *et al.*,<br><br>        Defendants. | Civil Action No. 24-cv-2713 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Plaintiff Trilogy Federal, LLC ("Trilogy"), a federal government contractor for financial management systems, sued six defendants—CivitasDX LLC ("CivitasDX"), Cognitive Medical Systems, Inc. ("CMS"), Halfaker and Associates, LLC ("Halfaker"), Science Applications International Corporation ("SAIC"), Client First Technologies, Inc. ("Client First"), and Kila Thomas—alleging misappropriation of trade secrets, breach of contract, tortious interference with contract, and tortious interference with a prospective business relationship. *See* Complaint, ECF No. 1. Two defendants, Halfaker and SAIC, seek dismissal of the claims against them. *See* Defs.' Halfaker & SAIC Mot. to Dismiss for failure to state a claim ("Moving Defs.' MTD"), ECF No. 30. For the reasons explained below, this dismissal motion is granted in part and denied in part, without prejudice.

## I.    BACKGROUND

### A.    Factual Background

As alleged in the complaint, Trilogy is a small, veteran-owned government contractor with expertise in implementing and maintaining the U.S. Department of Veteran Affairs ("VA")'s financial systems, Financial Management System ("FMS") and Management Information Exchange ("MinX"). Compl. ¶ 1. Some of this expertise was inherited, as Trilogy's

leadership previously worked for American Management Systems, the vendor that developed the FMS software, and additional expertise was developed through Trilogy's work on government contracts using those systems since the company's founding in 2009. *Id.* ¶¶ 20, 28, 32-35.

Trilogy used this expertise, including "identification of anticipated challenges," strategies for overcoming and addressing those issues," "technical assessments of systems," and "strategies for software configurations and designs," to develop a proposal in response to a request from the VA's Office of Information & Technology for a contract to "sustain[] and moderniz[e] the FMS and MinX systems" in 2016. *Id.* ¶¶ 21, 36-37. Trilogy alleges that those strategies, descriptions, and recommendations contained in the proposal were "trade secrets," which were kept confidential through measures such as confidentiality agreements with third parties and policies limiting employee disclosure. *Id.* ¶¶ 38-40. They were also disclosed only on a need-to-know basis and maintained on secure computer systems. *Id.*

For the 2016 proposal, Trilogy partnered with SRA International Inc. ("SRA"), which was later acquired by General Information Dynamics Technology, Inc. ("GDIT"). *Id.* ¶¶ 1, 22. SRA served as the prime contractor because Trilogy was not eligible for that role. *Id.* ¶ 22. Trilogy and GDIT won the bid and secured a five-year contract. *Id.* ¶¶ 22, 24. Although GDIT was the prime contractor, Trilogy "exclusively prepared the technical proposal," "performed all of the work for the contract," had "sole responsibility" for managing the FMS and MinX systems, and received positive feedback from the VA throughout the five-year contract period. *Id.* ¶¶ 22-23.

The VA solicited bids for a new contract for FMS and MinX support work in 2021 after extending Trilogy's contract for several months due to "delays in issuing a request for proposals." *Id.* ¶ 24. GDIT (SRA, at the time) was no longer able to serve as a prime contractor,

so Trilogy worked with B3 as its prime contractor instead (in addition to several other subcontractors). *Id.* ¶¶ 25, 28. GDIT, now as a subcontractor, teamed up with CivitasDX as prime contractor and Client First, another subcontractor. *Id*. ¶¶ 26-27; *Trilogy v. GDIT*, 24-cv-2772 (BAH), Compl. ¶¶ 12, 17 ("GDIT Compl."), ECF No. 1. CivitasDX is a joint venture, with no employees of its own, that acts through its members CMS and SAIC. Compl. ¶¶ 10, 27.

To Trilogy's surprise, the CivitasDX team won the 2021 bid. *Id.* ¶ 29. Trilogy alleges the CivitasDX team could not have won the bid without using Trilogy's trade secrets. *Id.* In fact, individuals associated with CivitasDX, SAIC, GDIT, Halfaker, and SAIC had solicited Trilogy employees to "assist [them] in preparation of CivitasDX's bid and [their] performance of the contract," after Trilogy had refused to join CivitasDX as another subcontractor. *Id.* ¶¶ 26, 49, 50. Trilogy later received word from "sources within the local government contracting industry" that the CivitasDX bid was indeed prepared using information taken from Trilogy's 2016 proposal. *Id.* ¶ 30.

Consequently, the CivitasDX team struggled to perform. The VA therefore "sought to further extend the Trilogy contract through December 31, 2021, in hopes that the incumbent Trilogy could assist with the transition to the new vendor." *Id.* ¶ 52. Later, once CivitasDX was at the helm, the VA again sought Trilogy's assistance with FMS management. *Id.* ¶ 55. The VA also requested proposals for a supplemental contract in spring 2024—despite CivitasDX's contract not set to expire until March 2025—because the agency could not get the required application services from its current vendor due to its "failed performance." *Id.* ¶ 57. Meanwhile, CivitasDX repeatedly solicited Trilogy's employees. *Id.* ¶¶ 50, 53.

Trilogy alleges that its former employee, Kila Thomas, improperly disclosed its trade secrets—from the 2016 proposal—to the CivitasDX team for use in their 2021 proposal. *Id.*

¶ 44.  Thomas "left Trilogy on bad terms" in March 2021 after not receiving a promotion and took a position at Client First.  *Id.* ¶¶ 41-42.  While Thomas did not work in a technical role, she had access to Trilogy's contracts and proposals, including the 2016 proposal.  *Id.* ¶ 43.  Trilogy alleges that she disclosed a copy of the 2016 proposal to Client First, CivitasDX, GDIT, CMS, and Halfaker and that these defendants then—knowing the information was confidential and taken from Trilogy—used the strategies and information therein to prepare the CivitasDX team's winning 2021 bid.  *Id.* ¶ 44.  In doing so, Thomas allegedly violated the policies in Trilogy's Employment Handbook, which prohibit revealing confidential information.  *Id.* ¶ 46.

As a result of losing the 2021 VA contract to CivitasDX, Trilogy "suffered extensive harm," including not receiving a share of the contract revenue and not having "future bidding opportunities with B3, as well as staffing on B3's existing projects."  *Id.* ¶ 31.

### B.    Procedural Background

Trilogy sued all of the parties involved in the CivitasDX bid—GDIT, CivitasDX, CMS, Halfaker, SAIC, Client First, and Thomas—alleging misappropriation of Trilogy's trade secrets, in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, and the District of Columbia Uniform Trade Secrets Act, D.C. Code §§ 36-401, *et seq.*, and tortious interference with its prospective business relationship with the VA through their submission of the 2021 bid. *Id.* ¶¶ 29-30, 44-47, 60-87, 105-112; GDIT Compl. ¶¶ 63-97 (claims against GDIT).  Trilogy also alleges a breach of contract by Thomas, Compl. ¶¶ 88-96, and tortious interference of its contract with Thomas by Client First, CivitasDX, CMS, Halfaker, and SAIC, *id.* ¶¶ 97-104.

These claims are set out in two related but separate cases before this Court: the instant matter, naming as defendants CivitasDX, CMS, SAIC, Halfaker, Client First, and Thomas, and *Trilogy v. GDIT*, 24-cv-2772 (BAH), naming GDIT as the sole defendant.  These two cases were not consolidated due to concerns about a counsel conflict of interest, but both were subject to the

same briefing timeline for initial responses to the complaint.  *See* Pl.'s Response to Show-Cause

Order Regarding Consolidation of Cases, ECF No. 26.  Defendants CivitasDX and CMS filed a

motion to dismiss or stay the litigation pursuant to the first-to-file rule, in light of a pending

related suit before the Southern District of California, *see* Defs. CivitasDX and CMS's Mot. to

Stay or Dismiss, ECF No. 31, which motion was denied, *see* Mem. Op. & Order, ECF No. 40.

Now pending before the Court is the motion filed by moving defendants SAIC and Halfaker to

dismiss the claims against them for failure to state a claim.  Moving Defs.' MTD.  In addition,

Trilogy has moved to strike certain of moving defendants' arguments that were introduced for

the first time on reply and used that motion as the vehicle for submission of a sur-reply, without

required leave of the Court, to respond to those arguments.  Pl.'s Mot. to Strike, ECF No. 41;

Pl.'s Sur-Reply, ECF No. 41-1; *see* Standing Order ¶ 7(b), ECF No. 3 ("A party may not file a

sur-reply without first obtaining leave of the Court and may do so only upon a specific showing

of good cause.").

## II.    LEGAL STANDARD

Although a plaintiff "need not make 'detailed factual allegations,'" a complaint "must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face" to survive a motion to dismiss on Federal Rule of Civil Procedure 12(b)(6).  *VoteVets*

*Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Such a plausible claim requires facts that are not

"'merely consistent with' a defendant's liability" but rather "allow[] the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

678 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 557 (2007)).  "A complaint survives a

motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the]

defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *VoteVets*

*Action Fund*, 992 F.3d at 1104 (alterations in original) (quoting *Banneker Ventures, LLC v.*

*Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)).

In deciding a 12(b)(6) motion to dismiss, a court accepts all factual allegations as true,

"even if doubtful in fact." *Twombley*, 550 U.S. at 555. A court does not, however, "assume the

truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in

the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief*

*Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

Generally, the court is limited to considering the pleadings on a motion to dismiss. FED.

R. CIV. P. 12(d). If the court considers matters outside of the pleadings, the motion is converted

to one for summary judgment, and both parties must be given "a reasonable opportunity to

present all the material that is pertinent to the motion." *Id.*

## III.    DISCUSSION

Trilogy alleges three types of claims against the moving defendants: trade secrets

misappropriation, tortious interference with contract, and tortious interference with a prospective

business relationship. Compl. ¶¶ 60-87, 97-112. Trilogy's factual allegations are sufficient to

state claims for trade secrets misappropriation but not for tortious interference with contract or

tortious interference with a prospective business relationship. Accordingly, moving defendants'

motion is denied with respect to counts I and II, but granted with respect to counts IV and V,

without prejudice.

### A.    Trade Secrets Claims: Count I (Federal Misappropriation of Trade Secrets, 18 U.S.C. § 1836) and Count II (Misappropriation of Trade Secrets under District of Columbia Law)

To establish liability for trade secrets misappropriation under either the federal Defend

Trade Secrets Act or the D.C. Uniform Trade Secrets Act, "a plaintiff must demonstrate the

existence of a trade secret that has been misappropriated." *Meyer Grp., Ltd. v. Rayborn*, No. 19-cv-1945 (ABJ), 2020 WL 5763631, at *4 (D.D.C. Sep. 28, 2020) (describing the elements under federal and D.C. law); *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 232 (D.D.C. 2016) (describing the elements under D.C. law); *Clevinger v. Advocacy Holdings, Inc.*, No. 23-cv-1159 (JMC), 2024 WL 3359508, at *8 (D.D.C. July 10, 2024) ("The elements of trade secret misappropriation are identical under federal and D.C. law."); 18 U.S.C. § 1836(b)(1); D.C. Code § 36-403.  Trilogy's allegations meet this standard.

A "trade secret" is defined as "all forms and types of . . . business, scientific, technical, economic, or engineering information, including . . . plans, . . . methods, techniques, processes, procedures, programs, or codes" if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known" to others who could "obtain economic value" from its "disclosure or use."  18 U.S.C. § 1839(3); D.C. Code § 36-401(4) (substantially the same).  "Information that is 'generally known or readily ascertainable to the public' . . . or 'generally known within an industry' . . . cannot constitute a trade secret." *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004) (first passage quoting *State ex rel. the Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E. 2d 661, 675 (1997); second passage quoting *Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 942 (7th Cir. 1996)).  "[P]laintiffs are not required to identify trade secret information in detail in order to avoid dismissal at the 12(b)(6) stage." *Aristotle Int'l, Inc. v. Acuant, Inc.*, No. 22-cv-741 (DLF), 2023 WL 1469038, at *8 (D.D.C. Feb. 2, 2023) (quoting *More than Gourmet, Inc. v. Finnegan*, 18-cv-2509, 2019 WL 13199822, at *6 (N.D. Ohio Sep. 19, 2019)); *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 24 (D.D.C. 2002).  "Rather, the information need be identified only 'with enough specificity to place a

defendant on notice of the bases for the claim being made against it.'"  *Aristotle Int'l*, 2023 WL 1469038, at *8 (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021)).

A trade secret is misappropriated if (A) acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means" or (B) disclosed or used "without express or implied consent by a person who" used improper means to acquire it, knew or had reason to know it was improperly acquired, or knew it was a trade secret accidentally or mistakenly acquired.  18 U.S.C. § 1839(5); D.C. Code § 36-401(2).  Put simply, the law prohibits unauthorized acquisition, disclosure, and use of trade secrets.  *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 113 (D.D.C. 2019).  Given that "misappropriation and misuse can rarely be proved by convincing direct evidence," plaintiffs "often rely on 'circumstantial evidence' that creates an inference of misappropriation."  *Aristotle Int'l*, 2023 WL 1469038, at *9 (first passage quoting *Oakwood Lab'ys*, 999 F.3d at 910).

Trilogy sufficiently alleges that its 2016 proposal included trade secrets.  In this regard, Trilogy describes information conveyed in the form of techniques and processes for managing the VA's financial systems, such as "detailed multi-step strategies to manage and prioritize day-to-day technical issues," "description of specific steps to be taken to support interface development," and "identification of specific daily functions to be managed to mitigate the risk of software down-time."  Compl. ¶ 37.  Such descriptions are sufficient, as Trilogy need not reveal in its complaint the content of the trade secrets themselves.  *See Aristotle Int'l*, 2023 WL 1469038, at *8; *DSMC, Inc.*, 273 F. Supp. 2d at 24.  Trilogy also alleges that the company took reasonable efforts to protect this information—*e.g.*, by "implementing confidentiality agreements with third parties, which . . . impose non-disclosure obligations," "implementing policies for employees on the importance of maintaining the confidentiality of Trilogy's Trade Secret

Information," and "maintaining" the information "on password-protected computer systems that restrict access" on a need-to-know basis, Compl. ¶¶ 38, 39—and that this information derives economic value, affording Trilogy "a competitive advantage over other companies that provide similar services," *id.* ¶ 40.  *See* 18 U.S.C. § 1839(5); D.C. Code § 36-401(4)

Trilogy sufficiently alleges misappropriation as well, contending that the moving defendants (among others on the CivitasDX team) used the information from Trilogy's 2016 proposal "to prepare CivitiasDX's proposal and bid on the 2021 VA Contract."  *Id.* ¶ 44.  The complaint sets out a plausible theory that the CivitasDX team obtained this information from Trilogy's former disgruntled employee, Thomas, and knew that the information "was highly confidential" and taken from Trilogy, despite Thomas's "confidentiality obligations to Trilogy." *Id.*  ¶¶ 44, 47.  Moving defendants were "fully aware" of such obligations due to their prevalence in the industry.  *Id.*  Such facts, if true, sufficiently state a claim for misappropriation under 18 U.S.C. § 1839(5)(B)(ii)(III) and D.C. Code § 36-401(2)(ii)(III): "use of a trade secret of another without . . . consent by a person who . . . knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief[, Trilogy,] to maintain the secrecy of the trade secret."

Moving defendants challenge the insufficiency of these allegations on several grounds, but none has merit.

### 1.    *Ownership of Alleged Trade Secrets*

First, moving defendants contend that Trilogy fails to allege facts establishing that the latter "owns the purported 'trade secret information,'" suggesting that the VA or American Management Systems, the original vendor of the financial management systems for whom many Trilogy employees previously worked, owns these trade secrets instead.  Moving Defs.' Mem. in

Supp. MTD ("Moving Defs.' Mem.") at 9-11, ECF No. 30-1 (relying primarily on out-of-circuit caselaw).  Trilogy responds that specific allegations of ownership are not required, citing the standard elements for a misappropriation claim set out in *Catalyst*, 350 F. Supp. 2d at 9, and noting that ownership is not included as a distinct element of the claim.  Pl.'s Opp'n at 10-11. Trilogy regardless makes sufficient allegations of ownership, stating that the "highly confidential strategies and procedures for IT system management" is "proprietary information" developed "over its many years of experience supporting federal clients in IT system modernization." Compl. ¶¶ 34-35, 62, 76.  Trilogy also alleges that it alone prepared the technical proposal in the 2016 contract.  *Id.* ¶ 22.  That Trilogy in fact has rightful ownership of the strategies and other confidential information described—as opposed to some other entity, as moving defendants suggest, Moving Defs.' Mem. at 10-11—is a factual counterargument that Trilogy need not anticipate and rebut in its complaint.

       To bolster their counterargument questioning Trilogy's ownership of the alleged trade secret information, moving defendants, in their reply brief, append as an exhibit an agreement between Trilogy and CSRA, which wholly owned SRA (GDIT's predecessor), filed in the related case, *Trilogy v. GDIT*, 24-cv-2722 (BAH), ECF No. 15-3, to insist that SRA owned the purported trade secrets, not Trilogy.  *See* Moving Defs.' Reply at 5; *id.*, Teaming Agreement, Ex. C § 3.1, ECF No. 38-3.  This strategy falls flat for at least two reasons.  First, the appended agreement contains text that CSRA "shall retain exclusive control over all Proposal activities," which moving defendants construe as giving SRA the right to the proprietary information in the 2016 proposal.  Moving Defs.' Reply at 5; Teaming Agreement, Ex. C. § 3.1.  That construction is an obvious stretch since "exclusive control over . . . activities" seems on its face different from

moving defendants' counterargument that CSRA retains proprietary ownership of all the information provided by Trilogy as the subcontractor.

Second, no matter the meaning of the Teaming Agreement text, the Court cannot look beyond the pleadings to decide such a question of fact regarding the actual ownership of the information on a motion to dismiss, especially when the issue is raised only in reply such that Trilogy has no opportunity to respond. *See* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). To avoid this well-settled procedural rule, moving defendants invoke *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215 (D.D.C. 2012), which credited that general rule but nonetheless noted that "where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Id.* at 217 (quoting *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd* 38 F. App'x 4 (D.C. Cir. 2002)); Moving Defs.' Reply at 2-3. That case is inapposite. In *Strumsky*, the court allowed introduction of a notice about retirement benefits on a motion to dismiss a complaint concerning plaintiff's entitlement to those retirement benefits because the notice was dispositive to plaintiff's claim. *Id.* By contrast, here, the Teaming Agreement between SRA (or GDIT) and Trilogy is not similarly "central" to Trilogy's complaint. Trilogy does not rely on that agreement for any of its factual allegations. Whether the agreement is binding and in fact grants ownership rights to GDIT may not be considered at the motion to dismiss stage.

##### 2.    *Existence of Actual Trade Secrets*

Next, moving defendants argue that Trilogy failed to allege that the information at issue constitutes "trade secrets" as a matter of law because the complaint does not allege reasonable measures to keep the information secret.  Moving Defs.' Mem. at 11-13.  In particular, they point out that the complaint does not allege what confidentiality obligations GDIT or Thomas owed Trilogy or what obligations the VA had to maintain confidentiality of information in the 2016 proposal.  *Id.* at 12-13.

"[A]bsolute secrecy" is not, however, required.  *Catalyst & Chem. Servs.*, 350 F. Supp. 2d at 10.  "Simply because information is disclosed outside of a company does not result in the loss of trade secret status."  *Id.* (quoting *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004)).  "[T]he owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied."  *Id.* at 10-11 (quoting *MicroStrategy*, 331 F. Supp. 2d at 416).  That is exactly what Trilogy alleges.  The company alleges that its information is disclosed only to "those persons who need to know such information to perform their work" and that it "implement[s] confidentiality agreements with third parties" and "policies for employees," "which . . . impose non-disclosure obligations."  Compl. ¶ 38.  Trilogy also alleges specifically that the information submitted to the VA was "on a confidential basis [and] Trilogy's government contract proposals are not made available to the public," *id.*, which certainly qualifies at least as "disclosure made in [implied] confidence," *Catalyst & Chem. Servs.*, 350 F. Supp. 2d at 10-11 (quoting *MicroStrategy*, 331 F. Supp. 2d at 416); *see also* Pl.'s Opp'n at 5 (pointing out that government contracts are, by law, protected from disclosure by the government, FAR 3.104-4).  Trilogy does not specify the provisions of its confidentiality

agreement with GDIT regarding the information in the 2016 proposal nor does Trilogy describe

in the Complaint the extent of the VA's confidentiality, but the more general alleged facts are

sufficient at this stage to demonstrate that Trilogy made "reasonable efforts" to maintain

confidentiality. *See Clevinger*, 2024 WL 3359508, at *8 ("The existence of a trade secret is

'generally a question of fact,' which 'ordinarily is best resolved by a fact finder after full

presentation of the evidence from each side.'" (quoting *DSMC, Inc.*, 479 F. Supp. 2d at 78-79)).[1]

### 3.    *Misappropriation of Alleged Trade Secrets*

Finally, moving defendants assert that Trilogy has not alleged unauthorized acquisition,

disclosure, or use by the moving defendants, thus failing to state a claim for misappropriation.

*See* Moving Defs.' Mem. at 13-14.  As support for this challenge, moving defendants contend

that Trilogy merely alleges that Thomas shared a copy of the 2016 proposal with Client First,

which then shared the proposal with its "teaming partners," who used the information to prepare

their bid, but Halfaker and SAIC were not, in fact, "teaming partners."  Moving Defs.' Mem. at

14; *see* Moving Defs.' Reply at 9-10; Compl. ¶ 44.  Trilogy, however, defines the "teaming

partners" as including "Halfaker/SAIC" in that same paragraph.  Compl. ¶ 44.  Whether Halfaker

and SAIC were involved, and the extent of any such involvement, in preparing the bid (or

whether only some combination of GDIT, CivitasDX, CMS, and Client First were involved) is a

---

[1]    Moving defendants reference a nondisclosure agreement (NDA) between CSRA/GDIT and Trilogy, filed in *Trilogy v. GDIT*, 24-cv-2772 (BAH), ECF No. 15-2, and appended as another exhibit to their reply in this case, Moving Defs.' Reply, Ex. B, ECF No. 38-2, to bolster their argument that Trilogy did not allege facts showing the NDA covered the 2016 proposal, though Trilogy made the argument in the parallel case against GDIT that the NDA governed their relationship with respect to the 2016 contract.  Moving Defs.' Reply at 6-7 & n.3.  Highlighting the NDA between Trilogy and GDIT does not really help the moving defendants, however.  The existence of a confidentiality agreement is a sufficient "method for preserving secrecy," and an allegation that a confidentiality agreement applied is enough at this stage.  *Meyer Grp.*, 2020 WL 5763631, at *6.  Whether the NDA covers the 2016 proposal is a question of fact that need not be resolved at this stage of the litigation.  *Meyer Group*, 2020 WL 5763631, at *6.  Further, as explained previously, *infra* Part III.A.1, evidence submitted on a reply to a motion to dismiss cannot be considered when that evidence is not "central" to the complaint, particularly when plaintiff does not have an opportunity respond.

question of fact, but the Court must accept as true Trilogy's allegations that they were involved—and thus "used" Trilogy's trade secrets.

Moving defendants further argue that they had no reason to know that the 2016 proposal contained information belonging to Trilogy and that they could not use the information, given that the 2016 proposal was also submitted with prime contractor GDIT and GDIT was now their partner on the 2021 bid.  Moving Defs.' Mem. at 7, 14.  That possibility would be inconsistent, however, with the alleged facts in the complaint.  Trilogy alleges that moving defendants acquired the information in the proposal through *Thomas*, not GDIT.  Compl. ¶ 44.  Moving defendants, according to the Complaint, knew that Thomas had worked for Trilogy and that she had confidentiality obligations because confidentiality obligations to former employers "are very common in the government contracting industry."  *Id.* ¶¶ 44, 47.  Moving defendants also knew that Trilogy, not GDIT, had expertise in the FMS and MinX systems: This was known in the industry, and for that reason, moving defendants solicited Trilogy's employees to work on the bid.  *Id.* ¶¶ 28, 29, 44, 47-49.[2]  Put together, these facts, accepted as true, sufficiently allege that moving defendants knew Thomas improperly disclosed information that belonged to Trilogy and was subject to confidentiality obligations.  Whether GDIT could have properly disclosed that same information to moving defendants or used that information itself is completely irrelevant.  To make out a claim for trade secret misappropriation, Trilogy need not plead facts showing that the trade secret could never have been acquired and used by any proper means (*e.g.*, through

---

[2]    Moving defendants point out that in the related action, *Trilogy v. GDIT*, 24-cv-2772 (BAH), Trilogy alleges that both Thomas and GDIT shared the 2016 proposal with moving defendants.  Moving Defs.' Mem. at 7; GDIT Compl. ¶ 46.  Thus, defendants argue, "it is even more unclear how or why SAIC and Halfaker would have known that the 'source' of the information" was Trilogy and not GDIT.  Moving Defs.' Mem. at 7-8.  The allegations in that complaint are irrelevant here.  Trilogy alleges here only that Thomas shared the 2016 proposal with moving defendants, Compl. ¶ 44, and that they knew she had held a business development role at Trilogy, *id.* ¶ 47.  Those facts support the allegation that moving defendants knew the information was Trilogy's and that it was subject to confidentiality obligations.  *See id.* ¶¶ 44, 47.

GDIT's disclosure, if GDIT had that right, as moving defendants suggest)—only that defendants in fact used a trade secret that they knew was improperly disclosed.  *See* 18 U.S.C. § 1839(5)(B)(ii)(III); D.C. Code § 36-401(2)(B)(ii)(III).  Accepting all these allegations as true, Trilogy sufficiently states a claim for trade secrets misappropriation.

### B. Tortious Interference with Contract between Trilogy and Thomas: Count IV

To state a claim for tortious interference with contract under D.C. law, the plaintiff must establish "(1) the existence of a contract, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of the contract's breach, and (4) damages resulting from the breach."  *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008) (quoting *Cooke v. Griffiths-Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992)).  Trilogy alleges that Thomas and Trilogy had a contractual relationship through the Employee Handbook, of which moving defendants were aware, and that moving defendants acted intentionally "by causing Thomas to breach her contractual obligations to Trilogy by communicating Trilogy's Confidential Information to them."  Compl. ¶¶ 98, 99-102.  Trilogy's facts in support of these legal conclusions, however, are insufficient to establish the first and third elements.

Regarding the first element, moving defendants correctly argue that Trilogy does not plead facts that would allow a court to infer that the Employee Handbook constituted a binding contract.  Moving Defs.' Mem. at 15.  Indeed, Trilogy pleads only that "all Trilogy employees are required to review and follow" the handbook and that Thomas's disclosure was "in violation of the policies."  *Id.* ¶ 46.  An employee handbook may or may not be a contract under Virginia law, depending on whether the parties engaged in offer and acceptance and intended to be bound. *See Spiller v. James River Corp.*, No. LW-2216-3, 1993 WL 946387, at *4 (Va. Cir. Ct. 1993); *White v. Fed. Express Corp.*, 729 F. Supp. 1536, 1548 (E.D. Va. 1990) ("In Virginia, provisions of employee manuals are not, *per se*, considered terms of the underlying employment contract.

. . . But the Virginia Supreme Court has held that the provisions of an employee handbook may constitute an offer of a unilateral contract which employees may accept by continuing their employment. *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 540-41 (1949).").[3]  Without further details on the Handbook at issue, such as whether Thomas received it and/or acknowledged in some fashion being bound by the policies contained in it, the Handbook, standing alone, does not support an inference that this document qualifies as part of the employment contract. *See Arpaio*, 797 F.3d at 19 (stating that courts do not "accept inferences that are unsupported by the facts set out in the complaint" (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007))).

Moving defendants also contest Trilogy's allegations for the second element—their knowledge of the contract. Moving Defs.' Mem. at 17.  Trilogy did allege, however, defendants' awareness of Thomas's confidentiality obligations to Trilogy based on the understanding that these are widespread in the industry. Compl. ¶ 47.  Moving defendants contend that such a conclusory allegation is insufficient because Trilogy does not allege that defendants knew Thomas, knew that she worked for Trilogy, or knew anything about the handbook. Moving Defs.' Mem. at 17.  To the contrary, Trilogy specifically alleged that Thomas "shared" the 2016 proposal with moving defendants (which presumes they knew of her identity) and that defendants knew she had a business development role at Trilogy, got this information from Trilogy, and had confidentiality obligations to Trilogy. Compl. ¶¶ 44, 47.  Defendants' knowledge of some obligation is thus sufficiently pled, despite the lack of sufficient allegations about a *contract*.

---

[3]      Both parties seemingly agree that whether the handbook is a contract is a question of Virginia law, given that Trilogy is headquartered in Virginia and Thomas resides there. *See* Moving Defs.' Mem. at 15; Pl.'s Opp'n at 21.

Regarding the third element, though, intentional procurement of a contractual breach, Trilogy's allegations are again insufficient, as moving defendants contend.  Moving Defs.' Mem. at 18.  Trilogy does not plead any facts suggesting that moving defendants induced Thomas to disclose Trilogy's trade secrets.  Trilogy points out that the complaint alleges moving defendants came together with the other defendants, despite lacking the requisite knowledge, to come up with a contract proposal, all while knowing that Trilogy had that knowledge and Thomas had confidentiality obligations to Trilogy.  Pl.'s Opp'n at 25.   Those facts do not, however, allow for the inference that moving defendants intended to get the requisite technical knowledge from Trilogy, let alone through Thomas—a single, nonexecutive employee at one of the subcontractors—and they fall notably short of the kind of "egregious conduct" that has qualified as "intentional interference" in the caselaw.  *See Gov't Rels. Inc. v. Howe*, No. 5-cv-1081 (CKK), 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007) ("Intentional procurement of a breach must involve egregious conduct such as 'libel, slander, physical coercion, fraud, misrepresentation, or disparagement.'" (quoting *Shepard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)).  Trilogy does not allege that the moving defendants asked Thomas to disclose the proposal, or even that they ever communicated with her.  She may have volunteered the 2016 proposal on her own accord, especially given her alleged animosity toward Trilogy where she "left . . . on bad terms," Compl. ¶ 42.  Trilogy's claim for tortious interference with contract thus is dismissed, without prejudice, with respect to the moving defendants.

### C.    Tortious Interference with Prospective Business Relationship: Count V

To establish liability for tortious interference with a prospective business relationship, a plaintiff must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and

(4) resultant damage." *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir.

1995) (describing the requirements under D.C. law). Trilogy alleges that the moving defendants

"willfully, knowingly, and without" justification, tortiously interfered with Trilogy's prospective

business relationship with the VA by misappropriating its trade secrets, improperly soliciting

employees, and unfairly competing. Compl. ¶¶ 108-10. Trilogy does not allege sufficient facts

to support the third element.

Moving defendants first challenge Trilogy's allegations of the existence of a valid

business expectancy. Moving Defs.' Mem. at 20. A legitimate business expectancy need not be

"grounded on present contractual relationships" but must be "commercially reasonable to

anticipate." *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56

(D.D.C. 2011). "Disappointed bidders . . . must therefore show a 'reasonable likelihood' of

receiving a contract." *Id.*; *see also Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C.

2012) (requiring a "probability" rather than "mere possibility" of a future contractual relationship

(quoting *Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, No. 4-cv-838 (RCL), 2006

WL 1147933, at *6 (D.D.C. Apr. 28, 2006))). "Where the ultimate decision to enter into a

business relationship is a highly discretionary decision reposed within . . . a governmental entity,

it becomes more difficult for a plaintiff to prove that it had an expectancy of doing business," *id.*

(alteration in original) (quoting *Mago Constr. Co. v. Anderson, Eckstein & Westrick, Inc.*, No.

183479, 1996 WL 33348794, at *2 (Mich. Ct. App. Nov. 8, 1996)), but not impossible, *see*

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 4-cv-332 (EGS), 2006 WL 2711527, at *1-

2, 20 (D.D.C. Sep. 21, 2006) (holding that the business expectancy was satisfied where the

plaintiff lost the opportunity to bid on a contract due to alleged actions).

Trilogy alleged that the VA granted GDIT and Trilogy the 2016 contract, that Trilogy was well-known in the industry as the only entity with the expertise to perform the contract, and that the VA sought help from Trilogy when defendants were unable to perform.  Compl. ¶¶ 55, 59.  Moving defendants argue that Trilogy nevertheless had no legitimate business expectancy with the VA as alleged, Compl. ¶¶ 106-09, because Trilogy was ineligible to bid as a prime contractor and thus would have not been in privity with the VA even if the B3-Trilogy bid won.  Moving Defs.' Mem. at 20.  Moving defendants cite no case, however, holding that a business expectancy requires privity of contract.  If Trilogy and B3 had won the bid, Trilogy would have had a "business relationship" with the VA, albeit indirect, as subcontractor-customer.  Trilogy does not fail to state a claim for that reason.

Moving defendants next argue that Trilogy's allegations are insufficient with respect to the third element.  Moving Defs.' Mem. at 21.  Intentional interference requires "'a strong showing of intent' to disrupt ongoing business relationships."  *Bennett*, 45 F.3d at 499 (quoting *Genetic Sys. Corp. v. Abbott Lab'ys*, 691 F. Supp. 407, 423 (D.D.C. 1988)).  "[T]he conduct at issue must involve egregious conduct such as libel, slander, physical coercion, fraud, misrepresentation, or disparagement."  *Nat'l R.R. Passenger Corp.*, 791 F. Supp. 2d at 60 (quoting *PM Servs. Co. v. Odoi Assocs., Inc.*, 3-cv-1810 (CKK), 2006 WL 20382, at *35 (D.D.C. Jan. 4, 2006)).  In addition to intent, plaintiff must demonstrate causation—that the interference caused a breach or termination of the expectancy.  *Id.*

Trilogy alleges that moving defendants willfully and knowingly interfered with Trilogy's relationship with the VA by misappropriating trade secrets, soliciting its employees, and "otherwise unfairly competing," and "[b]ut for" that interference, Trilogy would have been awarded the 2021 contract.  Compl. ¶¶ 109-10.  Moving defendants contend that Trilogy does

not allege facts showing they acted improperly because they "did *not* misappropriate Trilogy's trade secrets and did *not* employ Thomas."  Moving Defs.' Mem. at 22.  Such argument has no purchase at the motion-to-dismiss stage where the allegations are taken as true, and Trilogy has stated a claim for trade secrets misappropriation.

Moving defendants argue more persuasively, however, that Trilogy does not allege facts establishing that but for moving defendants' interference, the VA would have selected Trilogy and B3's bid.  Moving Defs.' Mem. at 20, 22.[4]  Presumably, Trilogy's bid also contained Trilogy's valuable trade secrets, so the VA could have equally selected the B3-Trilogy bid if those strategies were dispositive to its selection.  Considering that "the FMS and MinX work that Trilogy would have performed made up only a portion of the overall work required by the 2021 VA Contract," other portions of the work may have been the deciding factor, even if "the FMS and MinX work was the VA's first and highest priority."  Compl. ¶ 31.  Trilogy offers no facts allowing the inference that the VA chose CivitasDX's bid rather than B3's due to the fact that CivitasDX had Trilogy's trade secrets from 2016 rather than for any other reason.  The missing link between the alleged interference—including the trade secret misappropriation and solicitation of employees—and Trilogy's loss of the bid is fatal to Trilogy's claim.  Trilogy's claim for tortious interference with a business relationship is thus dismissed, without prejudice, with respect to the moving defendants.

## IV.    CONCLUSION

Trilogy sufficiently states a claim for relief for trade secrets misappropriation under federal and D.C. law, counts I and II in its complaint, but fails to do so for tortious interference

---

[4]    Moving defendants make some of their causation-related arguments—that Trilogy would not have otherwise won the bid—as part of their challenge to the first element as opposed to the third.  *See* Moving Defs.' Mem. at 20; Moving Defs.' Reply at 14.  The exact categorization of this argument is inconsequential; either way, Trilogy's allegations are insufficient.

with contract and tortious interference with a prospective business relationship, counts IV and V. For these reasons, moving defendants' motion to dismiss is granted in part and denied in part; counts IV and V are dismissed, without prejudice.  In addition, Trilogy's motion to strike new arguments from moving defendants' reply, ECF No. 41, is denied as moot because those arguments were rejected and the exhibits attached to moving defendants' reply, ECF Nos. 38-1, 38-2, and 38-3, were not considered.

In accordance with the Standing Order ¶ 4(a), the parties are reminded that they are required to file a Joint Meet and Confer Report within 14 days of the filing of this order.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  February 9, 2025

_____
**BERYL A. HOWELL**
United States District Judge