UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRILOGY FEDERAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CIVITASDX LLC, *et al.*,<br><br>Defendants. | Civil Action No. 24-2713<br><br>Judge Beryl A. Howell |
| CIVITASDX LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TRILOGY FEDERAL, LLC,<br><br>Defendant. | Civil Action No. 25-792<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The parties on both sides of this litigation appear to adhere to the old adage that the best defense is a good offense.  The result is a frustrating quagmire of numerous overlapping claims and counterclaims against multiple parties, accompanied by disparate factual narratives and opportunities for additional motion practice requiring judicial attention and consuming the resources of the parties, with this decision numbering the *fifth* Memorandum Opinion issued to resolve disputes among the parties since these related cases were filed less than one year ago. Having already considered motions to dismiss and otherwise govern adjudication of plaintiff Trilogy Federal LLC ("Trilogy")'s claims, *see Trilogy Federal, LLC v. General Dynamics Information Technology, Inc.* ("*Trilogy I*"), No. 24-cv-2772 (BAH), 2025 WL 387878, at *1 (D.D.C. Feb. 4, 2025) (granting motion for arbitration); *Trilogy Federal, LLC v. CivitasDX, LLC*

1

("*Trilogy II*"), No. 24-cv-2713 (BAH), 2025 WL 405409, at *3 (D.D.C. Feb. 5, 2025) (denying

motion to dismiss or stay in light of other litigation); *Trilogy Federal, LLC v. CivitasDX, LLC*

("*Trilogy III*"), No. 24-cv-2713 (BAH), 2025 WL 436850, at *1 (D.D.C. Feb. 9, 2025) (granting

in part motion to dismiss); *Trilogy Federal, LLC v. CitivasDX, LLC* ("*Trilogy IV*"), No. 24-cv-

2713 (BAH), 2025 WL 1293347, at *1 (D.D.C. May 5, 2025) (denying a stay in light of

arbitration), this Court now considers a new round of motions.  Specifically, Trilogy seeks

dismissal of the fifteen counterclaims asserted by defendants CivitasDX LLC ("CivitasDX") and

Cognitive Medical Systems, Inc. ("CMS") (collectively, "defendants"), *see* Defs.' Answer,

Affirmative Defs. & Counterclaims ("Defs.' Counterclaims") at 46-68, No. 24-cv-2713, ECF

No. 50, as well as fourteen claims brought by the same two defendants in a separate suit filed by

these defendants against Trilogy that has since been transferred to this Court and consolidated

with this case, *see* Defs.' First Am. Compl. ("Defs.' FAC"), No. 25-cv-792, ECF No. 20-3

(sealed).  *See* Pl.'s Mot. to Dismiss Transferred Compl. & Counterclaims ("Pl.'s MTD"), No. 24-

cv-2713, ECF No. 56.  For the reasons explained below, Trilogy's motion is granted, and all of

the claims by the two defendants asserted as counterclaims and in the transferred complaint are

dismissed.[1]

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are

described below.  Additional factual background is provided in the decision issued to resolve

other defendants' motion to dismiss Trilogy's complaint, Pl.'s Compl., ECF No. 1.  *See Trilogy*

*III*, 2025 WL 436850, at *1-2.

---

[1]    Unless otherwise indicated, all ECF numbers refer to the primary docket in this case, 24-cv-2713.

### A.    Factual Background

As alleged in defendants' amended complaint, defendants are two related California-based companies that provide technology solutions for government partners, with CMS being majority owner of CivitasDX, which itself has no employees. *See* Defs.' FAC ¶¶ 3-4, 12.[2] Trilogy is a Virginia-based small company that likewise serves as a technology consultant for government partners. *See id.* ¶ 5; *Trilogy III*, 2025 WL 436850, at *1 (citing Pl.'s Compl. ¶ 1). Trilogy implemented and maintained the financial management software system, pursuant to a contract, for the U.S. Department of Veterans Affairs ("VA") from 2016 to 2021. Defs.' FAC ¶ 19. Technically, Trilogy was the subcontractor on that contract, for which SRA International, Inc. was the prime contractor, until, during that contractual period, SRA International's parent company was acquired by General Dynamics Information Technology ("GDIT"). *Id.* ¶ 21.

### 1.    *2021 VA Contract*

The VA sought bids for a new service contract in 2021. *Id.* ¶ 22. Trilogy submitted a bid as a subcontractor with prime contractor B3 Group. *Id.* ¶¶ 23-24. Defendant CivitasDX served as prime contractor with subcontractors GDIT and Client First Technologies to submit another bid. *Id.* ¶ 25. Defendants' team was awarded the bid. *Id.* ¶ 26. Although a mechanism existed to challenge the VA's award to defendants, Trilogy did not do so, based on B3's advice to Trilogy that no grounds were available to protest defendants' ability to deliver services. *Id.* ¶ 27. Defendants allege that Trilogy nonetheless "engaged in a methodical campaign with the VA, including directly and continuously communicating with VA personnel, to disparage [their]

---

[2]    These allegations are largely repeated as part of defendants' Counterclaims. *See generally*, Defs.' Counterclaims.

business practices, reputation, and ability to deliver FMS/MinX System services to the VA with false and misleading statements regarding that ability made to the VA." *Id.* ¶ 16.

Trilogy allegedly wrote to the VA on at least three occasions expressing that defendants "lack the ability to deliver" the contracted services. *Id.* ¶¶ 29-31. The three emails—dated November 5, 2021; November 21, 2021; and December 3, 2021—are attached to defendants' amended complaint, Defs.' FAC, Ex. A, ECF No. 20-1; *id.*, Ex. B, ECF No. 20-2, as well as to Trilogy's motion to dismiss, Pl.'s MTD, Ex. A, ECF No. 56-2; *id.*, Ex. B, ECF No. 56-3, and excerpts from two of them are included in defendants' amended complaint, *see* Defs.' FAC ¶¶ 30-31 (quoting from emails dated November 19 and December 3). Defendants allege that in the November 19 email, Trilogy repeated a concern first raised in a November 5 email in the same email chain, stating that:

> [O]ver the past eight weeks, Civitas and each of its affiliated entities . . . have been relentlessly soliciting my employees who are uniquely qualified to perform the Financial Management System (FMS) Portion of the CCSS Taks Order. Notwithstanding the clear prohibitions set forth in the 'Use of VA Resources' Policy that was recently reissued . . . to . . . prime contractors, Civitas has improperly been using VA email and telephones in their attempts to recruit my employees.

*Id.* ¶ 30; *see also* Pl.'s MTD, Ex. A, Email from Eric McNutt, Trilogy, to Iris Farrel, VA (11/19/21) at 4.[3] According to defendants, "[t]hose statements were false and misleading, as neither" defendant "ever solicited Trilogy's employees." Defs.' FAC ¶ 30. Several weeks later, on December 3, 2021, Trilogy reached out again to the VA and expressed that "Civitas and its affiliated entities relentlessly attempted to recruit my staff, at times using VA email and phones to do so, which is prohibited." *Id.* ¶ 31; *see also* Pl.'s MTD, Ex. B, Email from McNutt to

---

[3]     Although the content of this email was previously under seal in the California Action, *see* Defs.' FAC ¶ 30; Unsealed Defs.' FAC ¶ 31, ECF No. 21 (displaying redactions); *id.*, Ex. A (sealed exhibit), Trilogy attached the email without sealing to its Motion to Dismiss, as cited above.

Kishore Vakkalanka et al., VA (12/03/21) at 7.  The email also indicated that defendants were "attempt[ing] to recruit staff directly" rather than "pursu[ing] any company to company teaming agreement" to get assistance from Trilogy.  Defs.' FAC ¶ 31; Pl.'s MTD, Ex. B.[4]  Defendants allege that those statements were also false.  Defs.' FAC ¶ 31.

Defendants also allege that Trilogy's "campaign" to "disparage" their "ability to deliver" the financial management services to the VA has continued.  *Id.* ¶¶ 32-33.  Without identifying when or where these statements in furtherance of such a "campaign" were made or appeared, defendants allege that Trilogy stated—somewhere, sometime—that "it was well understood within the IT consulting industry that a bidder very likely would only be successful if it had Trilogy, the highly experienced incumbent service provider, on its team," *id.* ¶ 34, and that the VA extended its 2016 contract to "eas[e] the transition to a new contractor that was sorely unprepared and lacked technical knowledge," *id.* ¶ 35.

These statements, combined with Trilogy's failure to leave documentation regarding maintenance of the financial management system, as required by VA policy, created the false narrative that defendants needed Trilogy employees to fulfill their contractual obligations and could not maintain the system on their own.  *Id.* ¶¶ 36-38.  Defendants did, nonetheless, build the necessary documentation to facilitate maintenance of the system, correcting for Trilogy's failing, without Trilogy's help.  *See id.* ¶¶ 37-38.

---

[4]       These excerpts from two emails are not repeated in the allegations accompanying the Counterclaims, but only generally referenced there.  *See* Counterclaims ¶ 28 ("Trilogy has repeatedly falsely and misleadingly stated to the VA that Counterclaim-Plaintiffs have solicited Trilogy's employees because Counterclaim-Plaintiffs allegedly lack the ability to deliver FMS/MinX System services to the VA at least through emails to the VA.  Those statements were false and misleading as neither Cognitive Medical nor CivitasDX ever solicited Trilogy's employees.").

2.      *2024 VA Contract*

In 2024, the VA sought bids for the next contract for maintenance of its financial management system. *Id.* ¶ 39. The day before the deadline for the bids, Trilogy contacted defendants alleging that defendants misappropriated its trade secrets and notifying defendants of its intent to sue. *Id.* ¶ 40. Defendants deny that they "use[d] any of Trilogy's alleged trade secrets or other confidential information allegedly possessed by" Kila Thomas, a former Trilogy employee who worked for Client First at the time of the 2021 bid, "or SRA International/GDIT to prepare [defendants'] contributions to [their] . . . 2021 Bid." *Id.* ¶ 50. According to defendants, "Trilogy intentionally sent its letter to [defendants]" with these allegations at that time "to further interfere in [their] ability to submit a bid in response to the RFP due" the next day. *Id.* ¶ 40. Defendants nonetheless timely submitted their bid to the VA. *Id.* ¶ 41.

The VA awarded the contract to Trilogy's team. *Id.* ¶ 42. In defendants' view, this contract award was "[b]ased on Trilogy's false and misleading statements narrative to the VA." *Id.* Defendants allege that this narrative "continues as Trilogy and [defendants] continue to submit competing bids for VA contracts that include the" financial management system "as a component." *Id.* ¶ 43.

B.      **Procedural Background**

This litigation involves an overlapping array of parties, motions, and related dockets. The key procedural developments are summarized here, with more detail available in the multiple cited opinions.

As already described, Trilogy sent a letter, on August 21, 2024, to defendants threatening suit based on misappropriation of trade secrets. *Id.* ¶ 40. Included in that letter was Trilogy's draft complaint for suit in this district, asserting claims of misappropriation of trade secrets under federal and state law and tortious interference with contract and a prospective business

6

relationship. *See Trilogy II*, 2025 WL 405409, at *1-2. Six days later, defendants filed their own suit against Trilogy in the Southern District of California, requesting a declaratory judgment with respect to the threatened causes of action and asserting several additional claims under the Lanham Act, California Unfair Competition Law, and California False Advertising Law, as well as claims of trade libel, intentional interference with contractual relations, and tortious interference with prospective relationships. *See CivitasDX LLC v. Trilogy Fed., LLC*, No. 24-cv-1522 ("California Action"), Compl., ECF No. 1 (S.D. Cal. Aug. 27, 2024); *Trilogy II*, 2025 WL 405409, at *2. In September, Trilogy filed the anticipated complaint in this Court, asserting claims against not only these two defendants but also other parties affiliated with the VA contracts—Thomas, Client First Technologies, Halfaker and Associates, and Science Applications International Corporation ("SAIC"), which is a joint venture member, along with CMS, of CivitasDX. *See generally*, Pl.'s Compl.; *Trilogy II*, 2025 WL 405409, at *1. In another, related case filed in this Court that was not consolidated due to conflict-of-interest concerns, Trilogy also asserted similar claims against GDIT. *See Trilogy v. GDIT* ("GDIT Case"), No. 24-cv-2772 (BAH), Compl., ECF No. 1; *Trilogy I*, 2025 WL 387878, at *1.

In December 2024, defendant GDIT moved to compel arbitration and stay litigation in the GDIT Case while arbitration was pending. *See* GDIT Case, Mot. to Compel Arb., ECF No. 12. This motion was granted, over Trilogy's opposition, and thus Trilogy's claims against GDIT are being adjudicated by an arbitral tribunal. *See Trilogy I*, 2025 WL 387878, at *5.

That same month, defendants SAIC and Halfaker moved to dismiss the claims against them for failure to state a claim. *See* Defs. SAIC and Halfaker's Mot. to Dismiss, ECF No. 30. That motion was granted in part and dismissed in part. Trilogy sufficiently alleged a claim for misappropriation of trade secrets under federal and D.C. law, but Trilogy did not state a claim for

tortious interference with the contract between Trilogy and its former employee, Thomas, nor for tortious interference with a prospective business relationship. *See Trilogy III*, 2025 WL 436850, at *3-9.

The two instant defendants also moved to dismiss or stay this litigation in light of the pendency of their claims against Trilogy in the California Action, pursuant to the first-to-file rule, a general principle whereby a court exercises its discretion to stay a later-filed case to allow a parallel suit to proceed to conclusion, avoiding duplicative efforts or inconsistent judgments. *See* Defs.' Mot. to Dismiss or Stay Under First-to-File Rule, ECF No. 31. That motion was denied, since, despite being filed first in the Southern District of California, the California Action was a "preemptive strike," which weighs in favor of "allowing the later filed action to proceed to judgment in plaintiff['s] chosen forum." *Trilogy II*, 2025 WL 405409, at *3 (alteration in original) (quoting *Thayer/Patricof Educ. Funding, LLC v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 30 (D.D.C. 2002)). Other factors, such as the ability to adjudicate finally all issues in the case and the general convenience for the parties, weighed in favor of continuing the parties' action before this Court. *See id.* at *4-5.

In March 2025, Trilogy filed an Amended Complaint with additional factual allegations and all of the original claims, including the previously dismissed counts. *See* Trilogy's First Am. Compl. ("Trilogy's FAC"), ECF No. 48. Defendants responded by asserting their counterclaims, which are nearly identical to the claims defendants asserted in the California Action. *See* Defs.' Counterclaims; Defs.' FAC. Around the same time, defendants also moved to consolidate this case with the GDIT case and to stay this case while the arbitration is proceeding. *See* Defs.' Mot. to Consolidate and Stay, ECF No. 49. That motion was denied, considering that the two cases were in a different posture, defendants demonstrated no need for consolidation or the stay,

and the interests of judicial efficiency did not favor a stay.  *See Trilogy IV*, 2025 WL 1293347, at
*3-5.

      Meanwhile, in the California Action, which had been preemptively filed against Trilogy,
defendants moved to transfer that case to this district, considering the overlap between that
action and this one.  *See* Defs.' Consent Mot. to Consolidate Cases ¶ 2, ECF No. 54.  Upon
transfer, that case was assigned a new docket number here, No. 25-cv-792, and assigned to this
Court based on the related pending cases.  Defendants subsequently moved to consolidate before
this Court both cases No. 24-cv-2713, where Trilogy's complaint was pending, and No. 25-cv-
792, the new transferred action.  *See* Defs.' Consent Mot. to Consolidate Cases.  With Trilogy's
consent, the consolidation motion was granted.  *See* Min. Order (Apr. 3, 2025).

      While discovery was proceeding on Trilogy's claims, Trilogy moved to dismiss all of the
counts in defendants' transferred complaint and all of defendants' largely duplicative
counterclaims.  *See* Pl.'s MTD.  Across the two pleadings, the following claims asserted by
defendants are pending, as organized into a chart to highlight their overlap:

| Defendants' Counterclaims, ECF No. 50 | Defendants' Transferred CA Complaint, No. 25-cv-792, ECF No. 20-3 |
|---|---|
| Count I:  Violation of § 43(a) of the Lanham Act.  ¶¶ 58-64. | Count I: Violation of § 43(a) of the Lanham Act.  ¶¶ 61-67. |
| Count II: Violation of California's Unfair Competition Law.  ¶¶ 65-73. | Count II: Violation of California's Unfair Competition Law.  ¶¶ 68-76. |
| Count III: Unfair Competition under Common Law.  ¶¶ 74-80. |  |
| Count IV: Violation of California's False Advertising Law.  ¶¶ 81-90. | Count III: Violation of California's False Advertising Law.  ¶¶ 77-86. |
| Count V: Trade Libel.  ¶¶ 91-94. | Count IV: Trade Libel.  ¶¶ 87-90. |
| Count VI: Tortious Interference with Contracts.  ¶¶ 95-101. | Count V: Intentional Interference with Contractual Relations.  ¶¶ 91-97. |
| Count VII: Tortious Interference with Prospective Business Relationship.  ¶¶ 102-07. | Count VI: Tortious Interference with Prospective Business Relationship.  ¶¶ 98-103. |

| Count VIII: Ongoing Tortious Interference with Prospective Business Relationship. ¶¶ 108-14. | Count VII: Intentional Interference with Prospective Economic Relations. ¶¶ 104-10. |
|---|---|
| Count IX: Declaratory Judgment, No Federal Misappropriation of Trade Secrets Under the Statute of Limitations. ¶¶ 115-19. | Count VIII: Declaratory Judgment, No Federal Misappropriation of Trade Secrets Under the Statute of Limitations. ¶¶ 111-15. |
| Count X: Declaratory Judgment, No Federal Misappropriation of Trade Secrets. ¶¶ 120-25. | Count IX: Declaratory Judgment, No Federal Misappropriation of Trade Secrets. ¶¶ 116-21. |
| Count XI: Declaratory Judgment, No Misappropriation of Trade Secrets Under State Law Under the Statute of Limitations. ¶¶ 126-32. | Count X: Declaratory Judgment, No Misappropriation of Trade Secrets under State Law Under the Statute of Limitations. ¶¶ 122-26. |
| Count XII: Declaratory Judgment, No Misappropriation of Trade Secrets Under State Law (California Law, D.C. Law, Virginia Law, or Other State Law). ¶¶ 133-38. | Count XI: No Misappropriation of Trade Secrets under California Law or Other State Law. ¶¶ 127-32. |
| Count XIII: Declaratory Judgment, No Tortious Interference with Contract with Thomas. ¶¶ 139-44. | Count XII: Declaratory Judgment, No Tortious Interference with Contract with Thomas. ¶¶ 133-38. |
| Count XIV: Declaratory Judgment, No Tortious Interference with Contract with SRA International / GDIT. ¶¶ 145-50. | Count XIII: Declaratory Judgment, No Tortious Interference with Contract with SRA International / GDIT. ¶¶ 139-44. |
| Count XV: Declaratory Judgment, No Tortious Interference with Prospective Business Relationship. ¶¶ 151-56. | Count XIV: Declaratory Judgment, No Tortious Interference with Prospective Business Relationship. ¶¶ 145-50. |

Defendants oppose the motion to dismiss.  *See* Defs.' Opp'n to Pl.'s MTD Transferred

Compl. & Counterclaims ("Defs.' Opp'n"), ECF No. 58.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face,'" although the allegations need not be "detailed."  *VoteVets Action Fund*

*v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).  The alleged facts must not be "'merely consistent with' a

defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 557 (2007)). "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (alterations in original) (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)).

In deciding a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations as true, "even if doubtful in fact," *Twombley*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

Generally on a motion to dismiss, the court is limited to considering the pleadings. *See* FED. R. CIV. P. 12(d). Where, however, certain documents are cited in the complaint and appended to the motion to dismiss, whose authenticity is not disputed, and those records are "integral to" the claims, they may be considered at the motion to dismiss stage. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

## III. DISCUSSION

Defendants have failed to state plausible claims for relief under any of their asserted counterclaims or in their independent action, and their declaratory judgment claims are duplicative of Trilogy's claims. Defendants' transferred complaint and counterclaims are therefore dismissed, and Trilogy's motion is granted.

### A. First Amendment Protection

At the outset, Trilogy challenges all of defendants' claims in their FAC ("Transferred Complaint") and counterclaims for the over-arching reason that the challenged conduct is

protected by the right to petition the government and argues that dismissal is warranted across-the-board of both these claims and counterclaims on this basis. *See* Pl.'s Mem. in Supp. of Pl.'s MTD ("Pl.'s Mem.") at 10, ECF No. 56-1. If only resolution of Trilogy's motion for dismissal of both the counterclaims and the Transferred Complaint were so easily accomplished. Defendants' allegations rely on statements made by Trilogy in its complaint filed in this Court—which statements are quoted by defendants in the Transferred Complaint filed in the California Action and in their counterclaims to Trilogy's FAC without identifying the source, *see* FAC ¶¶ 34-35; Counterclaims ¶¶ 31-32—and on Trilogy's email communications to the VA, *see* FAC ¶¶ 29-31. Defendants also reference Trilogy's transmission of a demand letter in advance of filing suit. *Id.* ¶ 40. In Trilogy's view, this conduct is protected by the litigation privilege and more broadly by the First Amendment right to petition. *See* Pl.'s Mem. at 10-15.

Defendants try to skirt Trilogy's argument about the litigation privilege by countering that "the Court need not reach" their allegations of statements made by Trilogy in Trilogy's FAC, nor those about the pre-litigation demand letter, and instead urge reliance on "Trilogy's literally false statements to the VA regarding [d]efendants [as] sufficient to sustain the Counterclaims." Defs.' Opp'n at 12; *see also id.* at 11. In other words, defendants' opposition relies solely on the statements from Trilogy's three emails to the VA (across two email chains), which defendants contend are not protected by the First Amendment because they were "literally false." *Id*. at 11. This Court follows this strategy and assesses the challenged counterclaims and claims without reference to defendants' allegations about statements that Trilogy made in its pleadings before this Court or its allegations about the sending of the demand letter. Defendants are correct that Trilogy's statements in two email chains to the VA are not protected both

because the First Amendment does not protect false commercial speech and because government contractors' right to petition in this context only extends as far as issues of public concern.

"For commercial speech" to receive First Amendment protection, "it at least must concern lawful activity and not be misleading." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983) (second passage quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).  Plainly, Congress can prohibit false, misleading commercial speech. *See infra* Part III.B (considering defendants' claim under the Lanham Act, which provides a private right of action for false commercial advertising).  The statements in Trilogy's three emails alleged to be false and misleading, *see supra* Part I.A.1—which allegation of falsity, in the current procedural posture, is assumed to be true—are therefore not protected by the First Amendment.

Trilogy contends that *Bolger* and defendants' argument about reduced constitutional protections for commercial speech concern "*free speech* rights, not the right to petition the government" and, because the two rights are not identical, should be rejected as inapposite. Pl.'s Reply at 5-6, ECF No. 59 (emphasis in original).  Trilogy intends to invoke only the right to petition. *Id.*  By invoking the right to petition, Trilogy seeks to immunize the entire emails from scrutiny and not merely the individual, challenged statements within them.[5]

---

[5]     Trilogy makes two additional arguments that the individual statements are nonetheless subject to free speech protections, though neither is meritorious.  First, Trilogy contends that the allegedly false statements to the VA are not "commercial speech," which Trilogy defines as "speech which does 'no more than propose a commercial transaction,'" according to *Bolger*.  Pl.'s Reply at 6 n.3 (quoting *Bolger*, 463 U.S. at 66).  *Bolger* stated explicitly, however, that although that definition is the "core notion of commercial speech," several other factors are also relevant to the determination of whether speech is "commercial."  463 U.S. at 66-67.  The Supreme Court concluded that the speech in question there was commercial not only because of its proposing a commercial transaction but also because the speech was motivated by economic concerns and referenced particular products. *See id.*  Here, although the emails do not plainly propose a commercial transaction, the content was *about* and *involved* commercial transactions—*i.e.*, contracts with the VA for FMS/MinX services—and referenced those particular services.  *See* FAC ¶¶ 30-31.  The emails were also written with economic motivation, as Trilogy is in the business of contracting with the government.  Trilogy thus cannot distinguish these statements as not being "commercial."  *See also United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (proposing a more nuanced definition of "commercial speech" in noting that beyond proposing a commercial transaction,

That argument does not help Trilogy, however, because, regardless of the alleged falsity of the speech, the right to petition does not protect Trilogy's emails here.  The First Amendment protects the right to "petition the Government for a redress of grievances," U.S. CONST., Amend. I, including "administrative agencies and the courts," *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 738 (D.C. Cir. 2011).  That right applies to public employees and government contractors, as well as ordinary citizens.  *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675-77 (1996).  Yet, First Amendment protection for government contractors' petitions is not absolute.  When the government is acting, for instance, as an employer rather than a sovereign, courts have recognized a broader ability to restrict petition and speech rights.  *See id.* at 676.  As a result, the law generally recognizes a First Amendment right for employees and contractors to speak or petition about "matters of public concern," wherein they are speaking in their capacity as citizens, but not necessarily to speak or petition about "personal grievance[s]" particular to their role as employees or contractors.  *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1329-30 (11th Cir. 2023); *see Bd. of Cnty. Comm'rs*, 518 U.S. at 675-77.  In short, "government contractors' petitions are constitutionally protected only if they involve matters of public concern."  *Zen Grp.*, 80 F.4th at 1329 (citing *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 808 (8th Cir. 2012)); *see also Heritage Constructors, Inc. v. City of Greenwood*, 545 F.3d 599, 602-03 (8th Cir. 2008); *cf. O'Donnell v. Barry*, 148 F.3d 1126, 1133

---

commercial speech may touch on "efficacy, safety, and quality" for "the purpose of persuading" the consumer to buy the product).

Second, Trilogy argues that its characterization in two of its emails to the VA of its employees being "uniquely qualified" "is an expression of opinion" and therefore protected.  Pl.'s Reply at 6.  Even if that descriptor is an expression of opinion, defendants have challenged the factual statements in the emails about defendants soliciting Trilogy employees.  Those statements are commercial in nature and allegedly false, so they are not subject to First Amendment protection.

(D.C. Cir. 1998) (holding that a public employee's speech must have been on a matter of public concern to be protected by the First Amendment in a retaliation claim).

The cases outlining those limitations generally involve First Amendment retaliation claims arising from the termination of employee or contractor due to some speech or a petition by the terminated person, who invokes First Amendment protection for that speech, rather than entities invoking the First Amendment as defenses to Lanham Act and other tort claims. *See, e.g.*, *O'Donnell*, 148 F.3d at 1133; *Zen Grp.*, 80 F.4th at 1323. The principles from those cases are nonetheless instructive here. A company's voicing of a concern to a contracting party is not protected by the First Amendment merely because that contracting party happens to be a government entity.

"Whether a [contractor's] speech is one of public concern," and thus potentially protected by the First Amendment, "depends on its content, form, and context, as revealed by the whole record." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (discussing in the context of public employees); *Zen Grp.*, 80 F.4th at 1330 (same, in the context of government contractors); *cf. Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 90 (D.C. Cir. 2015) ("Whether conduct constitutes protected petitioning activity 'depends not only on its impact, but also on the context and nature of the activity.'" (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 504 (1988))). "At a high level of generality, '[t]o fall within the realm of public concern, an employee's speech must relate to any matter of political, social, or other concern to the community.'" *Zen Grp.*, 80 F.4th at 1330 (quoting *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1162 (11th Cir. 2015)). As the D.C. Circuit has put it, matters of public concern "involve[] information that enables 'members of society to make informed decisions about the operation of their government.'" *Tao*, 27 F.3d at 640 (quoting *McKinley v. City of*

*Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).  Media coverage of the issue may indicate, for

instance, that a matter is likely one of public concern.  *See id.*; *see also O'Donnell*, 148 F.3d at

1134.  Commercial speech is unlikely to involve matters of public concern.  *White Plains Towing*

*Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993).

      Regarding the content and context, a court may consider "attempt[s] to make [the]

concerns public" and whether the petition has been used as "a platform to publicly air [one's]

concerns."  *Zen Grp.*, 80 F.4th at 1331-32 (last alteration in original) (first passage quoting *Alves*,

804 F.3d at 1162, and second passage quoting *Harmon v. Dallas Cnty.*, 927 F.3d 884, 895 (5th

Cir. 2019)); *see also Tao*, 27 F.3d at 640 (considering that the FBI employee did not resort solely

to the personal employee grievance process but also sent a letter to the Director of the FBI).  A

court may also consider the tone of the emails, such as whether they are "personal attacks,"

which are not considered matters of public concern, or rather broader "proposals for improving

departmental policy."  *LeFande v. District of Columbia*, 841 F.3d 485, 496 (D.C. Cir. 2016).

      The three emails from Trilogy to the VA on November 5, November 19, and December

3, 2021, that are alleged by defendants to be false and misleading should not be considered

petitions regarding "matters of public concern" afforded full First Amendment protection.  They

rather reflect an enterprise raising a personal grievance in a private manner with a business

partner—which happens to be the government, though acting as a patron rather than a sovereign.

Trilogy perceived itself as being personally targeted by solicitations from defendants, and the

emails raise that concern to the VA.  *See* Pl.'s MTD, Ex. A; *id.*, Ex. B.  Although Trilogy

mentions that such solicitations using VA systems violate VA contractor policies, and the public

may have a general interest that government policies are followed, this particular concern is far

removed from the kind of "information that enables 'members of society to make informed

decisions about the operation of their government'" and accordingly would warrant and attract public attention. *Tao*, 27 F.3d at 640 (quoting *McKinley*, 705 F.2d at 1114).

Moreover, the communications were private in nature—sent via email to select individuals at the VA—and framed as raising an individualized concern about a competitor government contractor, not a broader policy issue with the VA. In fact, the December 3, 2021, email from Trilogy makes clear that Trilogy's interest is protecting its own business interests and commercial relations with the government: "I raise this now, as I continue to hear comments that Trilogy spurned a Civitas offer or are somehow being uncooperative in our insistence not to continue support . . . . We have 25 active contracts with the VA and work hard every day to help VA achieve its mission." Pl.'s MTD, Ex. B at 7. The emails, highlighting a problem with a particular competitor, are more similar to individual personnel disputes about discrete incidents, *see Tao*, 27 F.3d at 639, such as complaints about performance evaluations, *see Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226-27 (6th Cir. 1997) (citing *Day v. S. Park Indep. Sch. Dist.*, 768 F.2d 696, 703 (5th Cir. 1985), *cert. denied*, 474 U.S. 1101 (1986)), or a particular employee's treatment, *White Plains*, 991 F.2d at 1058 (citing *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)), that have been held to fall outside of "matters of public concern," than to complaints exposing abuses, policy concerns, threats to public safety or other concerns about public affairs that affect citizens, *see Rendish v. City of Tacoma*, 123 F.3d 1216, 1224 (9th Cir. 1997) (discussing *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992)); *see also Tao*, 27 F.3d at 640-41 (holding that raising an issue of racial discrimination in a government entity was a matter of public concern).

Trilogy points to the example of *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), but that case is actually unhelpful to Trilogy. Pl.'s Reply at 3. In *Stern*, U.S. Gypsum, a

company targeted for an IRS audit, and U.S. Gypsum executives had communicated complaints about the conduct of an IRS agent, Stern, to his superiors at the agency. 547 F.2d at 1332-33, 1342. In particular, U.S. Gypsum accused Stern of "put[ting] an improper offer of settlement before [U.S. Gypsum]," "threaten[ing] [U.S. Gypsum] in an effort to coerce a settlement," and "indicat[ing] that failure to settle would be followed by long and expensive investigations by the IRS and other governmental agencies." *Id.* at 1333 n.5. As a result of raising that misconduct, Stern was removed from his assignment on the audit, and he received a notice of adverse employment action, proposing a reduction in his grade, salary, and responsibility. *Id.* at 1333. Stern responded by suing U.S. Gypsum, alleging state tort claims including defamation and interference with contractual rights, as well as a claim under 42 U.S.C. § 1985, which prohibits conspiracies to interfere with a federal officer performing his duties. *See id.* at 1331-32. In denying a motion to dismiss premised on Stern's failure to state any federal claim, thereby removing pendant jurisdiction over any other claim, the district court held that Stern did state a claim under § 1985. *See id.* at 1332-33. On interlocutory appeal, the Seventh Circuit reversed the district court, holding that the defendants' complaints about purported professional misconduct on the part of an IRS agent was a "classic example of the right to petition." *Id.* at 1343, 1346. Consequently, to avoid a potential conflict between § 1985 and the First Amendment, the court interpreted § 1985(1) narrowly not to "curtail this type of redress-seeking." *Id.* at 1345. The court there reasoned that the grievance did not need to "arouse sufficient public concern to generate political support" or even involve a "matter of public interest" to be considered a government petition protected by the First Amendment, nor did the existence of financial motive diminish that protection. *See id.* at 1342-43. Rather, the court considered crucial that the complaints were presented "to responsible government officials about

18

the conduct of their subordinates with whom the complainer had official dealings," and they were presented through the "proper and established channels." *Id.*

To be sure, as Trilogy emphasizes, Trilogy's three emails at issue here also involve a company in official dealings with the government making complaints to government officials, but the analogy breaks down in at least three ways. First and crucially, *Stern* involved a complaint to the government about the conduct of an IRS agent and abuse at his hands committed *by the government* acting in a sovereign capacity, which the court explained as the core of the right to petition: "[P]ublic criticism of governmental policy and those responsible for government operations is at the very core of the constitutionally protected free speech area." *Id.* at 1342. By contrast, here, Trilogy raised concerns to government officials about the conduct of another *private party* acting imprudently in a commercial capacity, which falls outside of that core protection of the right to petition. *Stern* is thus distinguishable on the scope of the right to petition the court there recognized.

Second, the Seventh Circuit's holding was narrow and explicitly acknowledged that, although the court read § 1985 to avoid causing potential First Amendment conflicts, other laws intended to protect citizens from knowing false statements may tolerate greater "peripheral chill of the right to petition." *Id.* at 1345. "We have no quarrel with the proposition that a state's interest in protecting citizens from common law torts justifies overriding these First Amendment considerations when knowing falsity is alleged," the court explained. *Id.* The court explicitly refrained from "implying that Stern's common law theories are unmeritorious." *Id.* "All that we decide today is that the real[,] if peripheral[,] chill of the right to petition . . . is significant enough for First Amendment values to play a part in construing federal legislation." *Id.* The court thus fell short of holding that U.S. Gypsum and the complaining IRS agents' complaints

were necessarily universally protected by the First Amendment under causes of action intended to protect citizens from false and defamatory statements—which are exactly the kinds of claims defendants have brought here.  The First Amendment right to petition cannot be read so expansively in the context of the Lanham Act and common law tort claims at issue.

Third, the court also seemed to recognize that the First Amendment would not necessarily protect complaints made in bad faith—*i.e.*, complaints made not genuinely to urge government conduct but rather to injure a competitor.  In discussing the *Noerr-Pennington* doctrine, which holds that genuine petitions to the government are not subject to Sherman Act antitrust liability, the court drew attention to the "sham" exception, wherein "sham" petitions that are "ostensibly directed toward influencing governmental action" but in fact are "nothing more than an attempt to interfere directly with the business relationships of competitor" are excluded from First Amendment protection.  *Id.* at 1344-45 (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).  The court reasoned that the "sham" exception to First Amendment protections was not applicable there because defendants' petition about Stern was genuinely directed at curtailing the misuse of power by the IRS agent.  Here, although Trilogy invokes the *Noerr-Pennington* doctrine as another basis for First Amendment protection, Pl.'s Mem. at 12 n.3 (citing, *inter alia*, *Sliding Door Co. v. KLS Doors*, No. 13-cv-196, 2013 WL 2090298, at *7 (C.D. Cal. May 1, 2013) (applying *Noerr-Pennington* to a Lanham Act claim)), defendants have effectively alleged a "sham" petition—the emails consisted of false statements to the government, purely commercial in nature, targeted at causing a competitor economic injury—so their emails are, again, distinguishable from *Stern*.  *See also Banneker Ventures*, 798 F.3d at 1137 n.8 (explaining that *Noerr-Pennington* does not apply to "'[p]rivate efforts to influence governmental bodies acting in an economic rather than a political framework, *e.g.*, a

governmental procurement agency,' . . . because they are business, not political, activity"
(quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir.
1981))).

Additionally, whatever the virtues of the Seventh Circuit's narrower reading of § 1985 to
avoid First Amendment concerns, as expressed in *Stern*, Trilogy's proposed interpretation of the
right to petition here would be problematic.  If *any* communication "designed to 'convey[] the
special concerns of its author to the government'" is absolutely protected by the First
Amendment's right to petition, even if inaccurate or maliciously designed to raise concerns about
a competitor, as Trilogy suggests, Pl.'s Reply at 5 (quoting *Borough of Duryea v. Guarnieri*, 564
U.S. 379, 388-89 (2011)), government contractors would be able to make false statements to the
government without suffering any repercussions.  That is not the law, and Trilogy has not argued
why its communications in particular should be protected absent such blanket immunity.

The challenged statements are therefore not protected by the First Amendment right to
speech or right to petition, and defendants' claims and counterclaims do not fail for that reason.

###    B.    Lanham Act Claim

Defendants assert, as Count I in both their Transferred Complaint and Counterclaims,
violations of the Lanham Act, 15 U.S.C. § 1125(a) *et seq.  See* Defs.' FAC ¶¶ 61-67;
Counterclaims ¶¶ 58-64.  The Lanham Act prohibits both false association and false advertising.
*See* 15 U.S.C. § 1125(a)(1)(A)-(B).  Defendants' allegation that "Trilogy has made false and
misleading statements of fact about [defendants'] FMS/MinX System services [which]
misrepresent the nature, characteristics, and/or qualities of [their] services and are expressly
false, impliedly false, or both" appears to assert a claim under the false advertising prong.  Defs.'
FAC ¶ 62; Counterclaims ¶ 59.  The false advertising provision prohibits the "use[] in
commerce" of "any false or misleading description of fact, or false or misleading representation

of fact, which—(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1).  In order to make out a claim for false advertising, a plaintiff "must show that [d]efendants 'made statements of fact in [their] commercial advertising promotion that were (1) false or misleading, (2) actually or likely deceptive, (3) material in their effects on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff[s].'"  *Fernandez v. Jones*, 653 F. Supp. 2d 22, 31-32 (D.D.C. 2009) (quoting *Globalaw Ltd. v. Carmon & Carmon Law Off.*, 452 F. Supp. 2d 1, 58 (D.D.C. 2006)).

In addition to satisfying these elements, "[t]o proceed with a false advertising claim, a plaintiff must satisfy two threshold requirements: First, the plaintiff must 'come within the zone of interests in a suit for false advertising,' requiring that the plaintiff 'allege an injury to a commercial interest in reputation or sales.'"  *Abrahams v. Simplify Compliance, Inc.*, No. 19-cv-3009 (RDM), 2021 WL 1197732, at *4 (D.D.C. Mar. 30, 2021) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014)).  "Second, the plaintiff's injuries must be 'proximately caused by violations of the statute,' which 'occurs when [the defendant's] deception of consumers causes them to withhold trade from the plaintiff.'"  *Id.* (alteration in original) (quoting *Lexmark*, 572 U.S. at 132-33).  These threshold requirements are sometimes viewed as part of the elements of the claim and sometimes as separate threshold limitations referred to as "statutory standing."  *See id.*; *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 58 (D.D.C. 2016).  Regardless, a plaintiff must demonstrate "economic or reputational injury flowing directly from the deception wrought by the

defendant's advertising" to succeed. *Abrahams*, 2021 WL 1197732, at *4 (quoting *Lexmark*, 572 U.S. at 132-33).

Trilogy argues that defendants have not stated a claim for two reasons: first, because the alleged statements are not "commercial advertising or promotion," given that they were not "disseminated sufficiently to the relevant purchasing public," Pl.'s Mem. at 17; and second, because defendants have not alleged "false or misleading statements regarding the quality of defendants' services," as required to state a claim, *id.* at 18-20 (citing 15 U.S.C. § 1125(a)(1)(B)). Defendants defend their allegations as stating a claim because Trilogy's emails to the VA were disseminated to the only relevant purchaser and thus constitute "commercial advertising or promotion," and the statements in the emails were "literally false" and disparaged their services. *See* Defs.' Opp'n at 13-20. Even assuming that the email statements could be considered in "commercial advertising or promotion," defendants have not alleged facts establishing that defendants' alleged injury—not being selected for the 2024 contract—was caused by or even related to Trilogy's statements.

Defendants fatally do not plead facts plausibly alleging that Trilogy's false statements at the end of 2021 about employee recruitment likely deceived the VA and were material to their decision not to renew defendants' contract three years later, nor relatedly, that the loss of that bid was proximately caused by the allegedly false statements, thereby failing both to establish the statutory standing requirement of proximate causation and to satisfy the elements of the claim requiring the same proximate causation.[6] The alleged statements themselves do not appear to be

---

[6]     Trilogy does not explicitly argue that defendants failed to plead causation. *See generally* Pl.'s Mem. Rather, Trilogy asserts that defendants did not state a claim because Trilogy's statements did not actually disparage defendants' services, a lack-of-disparagement argument premised on the Lanham Act's language itself rather than any specific element of a Lanham Act claim. *See* Pl.'s Mem. at 18-20. The causation issue is nonetheless sufficiently presented. Implicit in Trilogy's argument about the emails not disparaging defendants' services is the point that Trilogy's statements were irrelevant to and thus did not plausibly cause the VA not to select defendants in the next round of bidding. *See FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 661 F. Supp. 3d 765,

23

inherently material to the subsequent contracting decision.  As Trilogy points out, the "email correspondence upon which [d]efendants rely, which the Court may consider when determining this motion to dismiss . . ., unambiguously does not contain *any* statements regarding the quality of [d]efendants' services or their" ability to deliver services.  Pl.'s Mem. at 19 (emphasis in original).  Trilogy's statements are largely limited to complaining about defendants' solicitation of Trilogy employees, thus only indirectly addressing defendants' ability to perform their work.

While conceivable that statements about defendants violating VA policy in soliciting Trilogy's employees might lead the VA to reprimand or counsel defendants about their conduct or even to take steps to ensure defendants' compliance with applicable VA policies, no allegations of any of those possible results are presented, let alone any other allegations that these emails caused relations between the VA and defendants to sour irreparably over the course of the three-year gap such that the VA would not award defendants future contracts.  Defendants have simply not pled any facts of the sort.  Merely stating perfunctorily that the decision not to award defendants the 2024 contract was "[b]ased on Trilogy's false and misleading statements narrative to the VA," Defs.' FAC ¶ 42, defendants fail plausibly to connect the statements about recruiting Trilogy's staff to the 2024 contract award decision.  *See Iqbal*, 556 U.S. at 678 (holding that "mere conclusory statements" do not suffice to state a claim); *see, e.g.*, *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 661 F. Supp. 3d 765, 785 (M.D. Tenn.

---

782 (M.D. Tenn. 2023) ("Th[e] issues [of the existence of false, disparaging statements and causation] are distinct, but closely related.  The extent to which something is false or misleading bears on how likely it is to deceive, and how likely a statement is to deceive bears on how likely it is to cause harm.").  Indeed, the sole case to which Trilogy cites to make its lack-of-disparaging-statements argument, *Abrahams*, 2021 WL 1197732, dismissed a Lanham Act claim because the plaintiff had not pled a commercial injury caused by defendants' statements, *id.* at *5.  Pl.'s Mem. at 18-20.  Defendants picked up on this aspect of Trilogy's argument—*see* Defs.' Opp'n at 20 ("[T]o the extent [Trilogy] has challenged [d]efendants' pleading of injury, defendants[] have sufficiently pled injury under the Lanham Act.")—and plaintiff makes an explicit causation argument on reply, *see* Pl.'s Reply at 11.  Causation is therefore considered here.

2023) ("By failing to plead facts that would permit the court to conclude that [defendant] was, in fact," making such "significantly" false statements of fact "that [plaintiff] could plausibly have been harmed, [plaintiff] has failed to plead a Lanham Act violation.").

Defendants argue that, despite not explicitly criticizing defendants' services, the "clear import" of the false statements "is that only Trilogy could deliver the FMS services to the VA . . . and thus [d]efendants could not deliver those services to the VA without Trilogy employees." Defs.' Opp'n at 18.  In essence, defendants insist that the allegation that Trilogy implicitly disparaged defendants' services by raising the concern about recruitment is enough to state a claim.  *See id.* at 19.  Even accepting that the VA may have interpreted the emails to reflect negatively on defendants' business ethics and services, defendants still have not provided any facts indicating that the VA was influenced by or even remembered these emails several years later when awarding the 2024 contract.  To the contrary, the alleged facts and email chains in the record suggest that the VA did not take heed of Trilogy's emails, given that the VA did not even respond to at least Trilogy's first email, and although a VA employee responded to the second ("Confirming receipt.  I will look into it and respond accordingly."), the VA did not appear to take any action, prompting the third email.  *See* Pl.'s MTD, Ex. A (showing the emails on November 5 and November 19 to the VA and a response from the VA on the 19th); *id.*, Ex. B (email on December 3, suggesting the recruitment has continued unabated).[7]  Defendants also have not alleged that the individuals who received the emails were the same as those who made the 2024 contracting decision or that they even worked together.  Further, the intervening years, during which the VA continued to work with defendants and could make their own assessment

---

[7]    These email exchanges may be considered at this stage without converting the motion to one for summary judgment, *see Kaempe*, 367 F.3d at 965; Pl.'s Mem. at 9 n.2 (making this point), and, in fact, defendants do not challenge Trilogy's invocation of the emails.

of defendants' services, makes too remote the alleged injury, undermining the necessary

proximity between Trilogy's emails and defendants' failed bid. *See Campfield v. Safelite Grp.,*

*Inc.*, 91 F.4th 401, 411-12 (6th Cir. 2024) ("[T]he Lanham Act 'generally bars suits for alleged

harm that is "too remote" from the defendant's unlawful conduct.'" (quoting *Lexmark*, 572 U.S.

at 133)).  Defendants thus have not pled a causal link between the alleged statements and the

alleged harm.[8]

    To avoid this conclusion, defendants attempt to expand the scope of Trilogy's alleged

misconduct, contending that their allegations of "Trilogy['s] misrepresent[ations of d]efendants'

services and commercial activities" are not limited to the two email exchanges (consisting of the

three total emails) but also include Trilogy's failure to leave the VA with "documentation

regarding maintenance of the FMS/MinX System (violating VAP policy)," Defs.' Opp'n at 19,

which all together comprise a "campaign . . . to disparage" defendants' "ability to deliver . . .

services," *id.* at 16 (quoting Counterclaims ¶ 29).  The Lanham Act, however, only covers

statements and representations made in advertisements and promotions. *See* 15 U.S.C.

§ 1125(a)(1)(B).  Actions, such as failure to leave documentation, do not fall within that

---

[8]    Although causation and injury may be presumed in a small set of "direct comparator" Lanham Act cases, the circumstances here are far afield from such cases. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161 (2d Cir. 2007) ("In general, '[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some matter.'  We have held, however, that these elements may be presumed 'where [the] plaintiff demonstrates a likelihood of success in showing literally false [the] defendant's comparative advertisement which mentions [the] plaintiff's product by name.'" (first quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir. 1982), and then quoting *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992))); *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000).  Courts have held that in "false comparative advertising" cases, *Time Warner*, 497 F.3d at 162, where a defendant has explicitly compared a particular product, like an over-the-counter medication, with misleading statements about a "specific competing product" in an advertisement, some impact on consumers' purchasing and subsequent harm to plaintiff's position in the market can be presumed, *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994) (discussing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1998)).  Here, the emails lack similar direct comparison language, and where there is only a single purchaser and a single purchasing decision at issue, it does not make sense to assume some amount of market harm.  Trilogy's email statements lack the requisite proximity—whether proximate in time, in the locus of decision-making, or in foreseeability—to the 2024 contracting decision to allow for an inference that Trilogy's statements were at all responsible for the decision.

purview.  *See* Pl.'s Reply at 10 n.6 (making that argument).  In short, defendants have not

sufficiently indicated how the statements in Trilogy's emails had any impact on the VA or its

subsequent contracting decisions to state a claim under the Lanham Act.  Consequently,

defendants' Lanham Act claims in Count I of both their Transferred Complaint and

Counterclaims must be dismissed.

> **C.    California Law Claims: Unfair Competition Law and False Advertising Law**

Defendants next assert, as Counts II and IV of their Counterclaims and Counts II and III

of their Transferred Complaint, violations of two California statutes, the Unfair Competition Law

("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and the False Advertising Law ("FAL"), *id.*

§§ 17500, *et seq.  See* Counterclaims ¶¶ 65-73, 81-90; Defs.' FAC ¶¶ 68-86.  Both prohibit false

advertising and advertising that has a capacity or tendency to mislead a reasonable consumer.

*Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 774-77 (9th Cir. 2024).  The UCL is broader

than FAL such that "[a]ny violation of" FAL "necessarily violates the UCL."  *Kasky v. Nike,*

*Inc.*, 27 Cal. 4th 939, 950 (2002) (alteration in original) (internal quotation marks and citation

omitted)).

Trilogy argues that defendants have not stated a claim under these statutes for three

reasons: first, these statutes only provide causes of action for conduct occurring in California,

Pl.'s Mem. at 20-22; second, defendants' FAL claim fails because Trilogy's statements do not

constitute "advertising" disseminated to the "public," as contemplated by FAL, *id.* at 22-24; and,

finally, defendants have not alleged that Trilogy engaged in unlawful, unfair, or fraudulent

business practices, as required to state a claim under the UCL, *id.* at 24-26.  Defendants counter

that Trilogy's false statements to the VA "reach into California because they affect the national

operations of the VA, including in California."  Defs.' Opp'n at 20.  Further, defendants respond

to the last two grounds for dismissal that Trilogy's "literally false, disparaging statements" are competitive advertising and were unlawful, unfair, *and* fraudulent. *See id.* at 22-27.

Defendants have not stated a claim under the UCL or FAL for the simple reason that those statutes only cover conduct that occurred in California. The UCL "reaches any unlawful business act or practice committed *in California.*" *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (emphasis added). While the UCL may be "applied extraterritorially" where the harm occurs elsewhere, "the unlawful conduct that forms the basis of the out-of-state plaintiff's claim" must "occur[] in California." *Fontenberry v. MV Transp., Inc.*, 984 F. Supp. 2d 1062, 1067 (E.D. Cal. 2013) (citing *Sullivan*, 51 Cal. F.4th at 1207-09). Similarly, the statutory language of the FAL only prohibits materials "disseminated before the public *in this state*," meaning in California. Cal. Bus. & Prof. Code § 17500 (emphasis added).

Trilogy's statements were made in Virginia, where Trilogy is located, and transmitted to D.C., where the VA is headquartered. Although defendants are located in California, none of the challenged conduct occurred in and no challenged statements were transmitted to that state. None of that conduct is therefore actionable under these statutes. *See Zamfir v. CasperLabs, LLC*, No. 21-cv-474, 2023 WL 2415262, at *7 (S.D. Cal. Mar. 8, 2023) (dismissing plaintiff's UCL claim because plaintiff did not plead facts to support that the challenged conduct "occurred in California").

Defendants strain to fit their claims within the statutory limits of the UCL and FAL, reasoning that Trilogy's misrepresentations to the VA as to defendants' services includes all of the VA, including VA components in California. *See* Defs.' Opp'n at 20-22. Defendants cite no case, however, supporting this expansive reasoning to give national reach to these California statutes. Rather, several cases cited by Trilogy, Pl.'s Reply at 12-13, confirm that with respect to

statements made, either the source of the statements or the intended audience must be primarily in California. *See, e.g.*, *Ali v. Am. Airlines, Inc.*, No. 23-cv-850, 2023 WL 4239065, at *6-7 (E.D. Cal. June 28, 2023) (explaining that "if the liability-creating conduct occurs outside of California, California law generally should not govern," and concluding that "because most of the events in the complaint appear to have occurred outside California . . . and [plaintiff] does not allege that any advertisements were made or disseminated in or from California," plaintiff failed to state a claim under UCL and FAL (first passage quoting *Omaha v. Delta Air Lines*, 889 F.3d 1075, 1079 (9th Cir. 2018))); *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 605 (S.D.N.Y. 2022) (holding that plaintiff could not "bring a claim under the UCL merely because he is a California resident who allegedly suffered injury in California"); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011) ("Plaintiffs have not alleged with sufficient detail that the point of dissemination from which advertising and promotional literature *that they saw or could have seen* is California. Accordingly, [their] claims under the UCL . . . are dismissed." (emphasis in original)).

Even if some VA officials are in California, the emails were sent only to a few discrete individuals at the VA. Defendants do not allege that those officials, or others key to the decision-making for the financial management services, are in California. The challenged conduct is thus too divorced from the state to sustain a claim under these state-law statutes. Consequently, Counts II and IV of defendants' Counterclaims and Counts II and III of their Transferred Complaint, alleging violations of California's UCL and FAL must be dismissed.

### D.    Common Law Unfair Competition Claim

Defendants assert a common law unfair competition claim as Count III of their

Counterclaims.  *See* Counterclaims ¶¶ 74-80.  Their allegations and briefing invoke District of

Columbia law.  *Id.* ¶ 75; Defs.' Opp'n at 27.[9]

"The District's case law does not define unfair competition 'in terms of specific

elements,' but rather by way of example, describing 'various acts that would constitute the tort if

they resulted in damage.'"  *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 509 (D.C. Cir.

2020) (quoting *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 57 (D.D.C. 2001)).  These various

acts include "defamation, disparagement of a competitor's goods or business methods,

intimidation of customers or employees, interference with access to the business, threats of

groundless suits, commercial bribery, inducing employees to sabotage, [and] false advertising or

deceptive packaging."  *Id.* (quoting *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3

(D.C. 1982)).

Defendants rely on the "disparagement" theory, alleging that Trilogy has "systematically

misrepresented" defendants' services "to the public in the industry," Counterclaims ¶ 76.  *See*

Defs.' Opp'n at 27.  Trilogy argues the unfair competition common law tort is extremely limited

and that even under a "disparagement" theory, Trilogy's "legitimate purpose" for sending a

demand letter and emailing the VA justifies dismissal of defendants' claim.  Pl.'s Mem. at 28.  In

defendants' view, however, consideration of motivation is improper at the motion to dismiss

stage.  Defs.' Opp'n at 28.  Regardless of whether Trilogy had a "legitimate business motivation"

and whether that such motivation is relevant at this stage, defendants have not stated an unfair

---

[9]      As Trilogy points out, D.C. does have an unfair or deceptive trade practices statute, D.C. Code § 28-3904, but defendants appear to be stating a claim solely under common law.  *See* Pl.'s Mem. at 27 n.5; Defs.' Opp'n at 27.

competition claim because they have not plausibly alleged injury proximately resulting from the challenged emails.

As with any tort action, the harm alleged must stem from the challenged conduct to state an unfair competition claim. *See* JONATHAN COOPERMAN & JACLYN METZINGER, 13 BUS. & COM. LITIG. FED. CTS. § 141:9 (5th ed. 2024); *K&D LLC*, 951 F.3d at 509 (describing the common law claim as constituting "various acts that would constitute the tort *if they resulted in* damage" (emphasis added) (quoting *Furash*, 130 F. Supp. 3d at 57)). Yet, as already explained, defendants have not linked Trilogy's emails in 2021 to their failure to secure renewal of the contract in 2024. *See supra* Part III.B. Defendants argue that "Trilogy's literally false statements to the VA . . . ultimately had the intended effect of displacing [d]efendants as the service provider to the VA and replacing them with Trilogy." Defs.' Opp'n at 28 (citing Counterclaims ¶ 70). Even assuming Trilogy's statements qualify as "disparagement," as contemplated by D.C. common law, defendants have only made conclusory statements as to how such disparagement caused the alleged injury. As Trilogy put it, "[i]t defies plausibility to conclude that this email correspondence, sent *three* years before the VA awarded the 2024 contract to Trilogy, were designed to 'annihilate' [d]efendants' business," or even their chances at the 2024 contract. Pl.'s Reply at 18 (emphasis in original). Consequently, defendants' common law unfair competition claim in Count III of their Counterclaims must be dismissed.

### E.    Trade Libel

Defendants next bring claims of trade libel, as Count V in their Counterclaims and Count IV in the Transferred Complaint. *See* Counterclaims ¶¶ 91-94; Defs.' FAC ¶¶ 87-90. The common law tort of trade libel "protects against false statements that disparage the plaintiff's interest in, or the quality of the plaintiff's land, chattels, or intangibles." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 n.6 (D.C. Cir. 1985) (citing RESTATEMENT (SECOND) OF

TORTS § 623A cmt. a (A.L.I. 1977)).   To state a claim of trade libel under common law, "the plaintiff must allege pecuniary harm resulting from the defendant's unprivileged publication of false statements, with knowledge or reckless disregard of the falsity, concerning the plaintiff's property or product." *Id.* (citing *Golden Palace, Inc. v. Nat'l Broad. Co.*, 386 F. Supp. 107, 109 (D.D.C. 1974), *aff'd without opinion*, 530 F.2d 1094 (D.C. Cir. 1976)); *see also 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 118 (D.D.C. 2015) (citing *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).   Regarding the plaintiff's harm, plaintiff must also allege "special damages," which "unlike general damages are 'not the necessary consequence of [the] defendant's conduct, [but] stem from the particular circumstances of the case'" and are "subject to a heightened pleading standard." *3M Co.*, 842 F. Supp. at 118 (alterations in original) (quoting *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002)).   "A plaintiff 'can satisfy this pleading obligation by identifying either particular customers whose business has been lost or facts showing an established business and the amount of sales before and after the disparaging publication, along with evidence of causation.'" *Id.* (quoting *Browning*, 292 F.3d at 245).

Trilogy argues that defendants' allegations fall short of pleading several of the required elements, including lack of privilege for the statements, publication, falsity, and special damages, including causation.  Pl.'s Mem. at 30-32.  Defendants respond that the alleged libelous statements, which they identify mainly as the November 19 and December 3, 2021, emails from Trilogy to the VA, *see* Defs.' FAC ¶¶ 30-31, indeed constitute false statements and that by identifying the specific contract lost with the VA, defendants have sufficiently pled special damages, Defs.' Opp'n at 19-31.

Trilogy is correct that defendants' allegations fail to plead causation here, for the reasons previously described.  *See supra* Parts III.B, III.D.  In *3M*, the court held that the plaintiff did not

plead any "*facts* supporting the conclusion that 3M's actual damages were the 'natural and direct result of the Defendants' conduct." 842 F. Supp. 2d at 118 (emphasis in original) (quoting *Browning*, 292 F.3d at 245 ). The court explained that "the allegations of causation upon which 3M relies for this claim are conclusory statements alleging that Defendants caused damage to 3M, with no specific facts reflecting that causation," so dismissal of the claim was warranted. *Id.* The same is true here. Defendants have two allegations of harm for this claim: loss of the 2024 bid for the contract, FAC ¶ 42, and a vague reference to "direct financial harm" including "special damages in the form of lost sales and profits, loss of goodwill, and increased advertising and marketing costs in the industry, including at least the VA," *id.* ¶ 90. Neither of these harms is supported by *facts* showing how they are a "natural and direct result" of the alleged misconduct. Defendants merely state, without support, that the awarding of the contract to Trilogy in 2024 was "[b]ased on Trilogy's false and misleading statements" and that the financial harm was a "proximate result." *Id.* ¶¶ 42, 90. The conclusory allegations do not suffice.

Defendants argue that their facts "identif[ying] Trilogy's literally false emails disparaging defendants[], . . . including the dates of those emails, and the subsequent date of the VA's award to Trilogy" are "specific facts of causation." Defs.' Opp'n at 31. Those facts might establish both the misconduct and the injury, but they lack a link and thus do not plausibly allow for a causal inference. The allegedly false statements were made three years before the next contract award, during which time the VA worked closely with defendants and had opportunity to observe their abilities and ethics. Defendants do not cite any additional facts supporting causation in their Opposition. The trade libel claims in Count V of defendants' Counterclaims and Count IV in the Transferred Complaint are therefore dismissed.

F.    **Tortious Interference with Contract**

Defendants assert several claims of tortious interference, including tortious interference with an existing contract, set out in Count VI of the Counterclaims and Count V in the Transferred Complaint (styled as "intentional interference with contractual relations"), which are discussed in this Section.  *See* Counterclaims ¶¶ 95-101; Defs.' FAC ¶¶ 91-97.[10]  Defendants have not stated a claim for tortious interference with contract because they have not alleged actual breach of any contract or disruption to contractual relations, nor have they alleged any injury caused by such breach or disruption.

As an initial matter, the parties dispute which state's law and what elements apply to the tortious interference claims.  Trilogy invokes D.C. common law, contending this law requires allegations of "(1) the existence of a contract, (2) knowledge of the contract, (3) intentional interference causing breach of the contract, and (4) damages."  Pl.'s Mem. at 33 (citing *Banneker Ventures*, 798 F. 3d at 1134); *Banneker Ventures*, 798 F.3d at 1134 (citing those elements for "tortious interference under District of Columbia law").  While plaintiffs contend that defendants did not plead any breach, Pl.'s Mem. at 34, defendants argue breach is not a necessary element of the claim, since "a mere[] failure of performance will do," Defs.' Opp'n at 33 (alteration in original) (internal citations omitted) (quoting *Econ. Rsch. Servs. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 228-29 (D.D.C. 2016)).  Defendants further argue that this claim is not limited to D.C. law, *id.*, and under California law, a tortious interference with contract claim requires only "disruption of the contractual relationship."  *Id.* (quoting *Spotlight Ticket Mgmt. v. Concierge Live, LLC*, No. 24-cv-859, 2025 WL 235429, at *5 (C.D. Cal. Jan. 2, 2025)).

---

[10]    The claims alleging tortious interference with prospective relationships are discussed in the next section, *infra* Part III.G.

Whether a breach of contract under D.C. law or a mere disruption of the contractual relationship under D.C. or California law applies makes no difference because defendants have not stated a claim even under their preferred California common law standard. Defendants cite, Defs.' Opp'n at 33-34, to California case law which establishes that the "[p]laintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations. We have recognized that interference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990). Defendants point to their allegations that Trilogy interfered with their 2021 VA contract by not providing the necessary documentation regarding maintenance of the financial management system, which "hinder[ed] [their] contractually required maintenance," requiring them to "build such a documentation repository for the VA for any subsequent contractor to the VA." Defs.' Opp'n at 34 (citing Counterclaims ¶¶ 33-34). Even assuming the truth of these allegations, however, defendants fail to plead facts exemplifying how their work was "hinder[ed]" and thus how their contractual relations with the VA were disrupted. Nowhere do defendants allege that they were unable to meet their contractual obligations, that Trilogy's lack of documentation impaired their ability to meet those obligations, or that defendants' obligations became more costly or time-consuming. On the contrary, defendants state that they successfully built the document repository that Trilogy failed to leave. *See* Defs.' FAC ¶ 37. Not only is any inference of interference inconsistent with that outcome, but also the term "hinder[ed]" suggests a level of inconvenience too trivial to qualify as disruption to the contract. Defendants do not point to any case with similar facts where a tortious interference claim succeeded under California law.

Moreover, even if the bare allegation of Trilogy "hindering [defendants'] contractually required maintenance" qualified as "interference" with the contractual relationship, defendants have not alleged any injury resulting from that "hindr[ance]," which California law also requires for tortious interference.  *See Spotlight Ticket Mgmt.*, 2025 WL 235429, at *5 ("The elements of tortious interference with contractual relations are '(1) a valid contract between plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)); *see also Banneker Ventures*, 798 F.3d at 1135 (also requiring resultant damage for tortious interference under D.C. law).  Defendants make the conclusory statement that the interference caused them financial harm with generalities, falling short of explaining the concrete nature, scope, or extent of that harm.  Defs.' FAC ¶ 96 ("As a proximate result of Trilogy's interference, Plaintiffs have suffered or will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with Plaintiffs' VA Customers.").  Such vague allegations do not state a cognizable injury.

Defendants also fail to allege how the interference *caused* that harm or any other harm, including the loss of the 2024 bid.  The lack of factual allegations indicating how Trilogy's failure to leave documentation impaired defendants' ability to fulfill their contractual obligations, also undercuts reliance on this same failure as the cause for their loss of the next contract, particularly given that defendants allege they met all of their contractual obligations by providing the documentation themselves.  *See* Defs.' FAC ¶ 37.  Defendants then shift to point to Trilogy's

36

allegedly false statements as the reason they lost the bid. *See id.* ¶ 42 ("Based on Trilogy's false and misleading statements narrative to the VA, . . . the VA awarded the 2024 contract . . . to a team that included Trilogy."). Even interpreting defendants' allegations generously—that together the false statements and Trilogy's lack of documentation is what caused the loss of the 2024 bid—neither of those acts are proximately tied to the loss of the bid to allow for a causal inference. *See supra* Parts III.B, III.D, III.E.

Whether due to the lack of any disruption to contractual relationships, the lack of any cognizable injury, or the lack of any causal connection between the alleged contractual disruption and the injury, defendants have fallen short of stating a claim for tortious interference. Consequently, Count VI of the Counterclaims and Count V in the Transferred Complaint for tortious interference with contract must be dismissed.

## G.    Tortious Interference with Prospective Relations

Finally, defendants assert claims of tortious interference with prospective business relationship under Count VII of their Counterclaims and Count VI of their Transferred Complaint, as well as ongoing interference with a prospective relationship under Count VIII of the Counterclaims and intentional interference with prospective economic relations under Count VII in their Transferred Complaint. *See* Counterclaims ¶¶ 102-14; Defs.' FAC ¶¶ 98-110.

Trilogy and defendants agree that tortious interference with prospective relationships requires "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995); Pl.'s Mem. at 35; Defs.' Opp'n at 35. Trilogy argues that defendants have failed to plead egregious conduct demonstrating *intentional* interference, as well as any actual interference causing termination of

any legitimate expectancy.  Pl.'s Mem. at 35-37.  Defendants reject that "egregious conduct" is required and contend that, in any case, Trilogy's false statements and failure to leave documentation suffice.  Defs.' Opp'n at 35-36.  Moreover, defendants insist that they had a valid business expectancy in the 2024 contract that Trilogy successfully interfered with.  *Id.* at 36-38.

Regardless of whether the alleged misconduct was sufficiently egregious and intentional and whether defendants had a valid business expectancy in the 2024 contract, defendants have not sufficiently pled that Trilogy caused them to lose the 2024 bid.  As previously explained, *see supra* Parts III.B and III.F, defendants have only stated in a conclusory manner that Trilogy's alleged misconduct—the false statements in three emails to the VA and the failure to leave documentation—caused the VA to pick Trilogy's bid over theirs in 2024.  Defendants allege that they recreated the documentation that Trilogy failed to provide, *see* Defs.' FAC ¶ 37, and make no allegation that the VA was in any way dissatisfied with their efforts or documentation or that any other circumstances would lead to an inference about Trilogy's alleged misconduct leading to a decline in defendants' relationship with the VA.  *See* Pl.'s Reply at 23 ("[It] is implausible to conclude that a three-year-old email exchange or Trilogy's inadequate document repository caused the VA to stop doing business with Defendants three years later.").  Defendants therefore have not pled that Trilogy tortiously interfered with a business expectancy, even assuming that the 2024 contract can be considered such an expectancy at all.

Regarding defendants' claim about ongoing interference with prospective business relationships, defendants' allegations are far too bare.  Defendants do not identify any contracts they reasonably expect to secure with the VA or specify how Trilogy has and continues to interfere with them.  To compensate for the absence of supportive allegations for this claim, defendants suggest that the "Court can take judicial notice that the VA is still considering such

bids for further FMS/MinX system services contracts" and point to a declaration establishing that fact, Defs.' Opp'n at 38, but they have not alleged why they have a reasonable business expectancy in those contracts, nor how Trilogy is interfering with them.  Defendants therefore have not stated a claim for ongoing tortious interference.  *See Xereas v. Heiss*, 933 F. Supp. 2d 1, 11 (D.D.C. 2013) ("A claim of tortious interference with prospective business relations cannot survive where the plaintiff does not allege any specific future business relations or expectancies and only provides general references to potential opportunities.").  Consequently, defendants' claims in Counts VII and VII of their Counterclaims and Counts VI and VII of their Transferred Complaint, must be dismissed.

### H.    Declaratory Judgment Claims

Defendants' remaining claims—Counts IX through XV of the Counterclaims and Counts VIII through XIV of the Transferred Complaint—request declaratory judgments on claims asserted affirmatively by Trilogy.  *See* Counterclaims ¶¶ 115-56; Defs.' FAC ¶¶ 111-50.  Trilogy argues that they should all be dismissed as duplicative because "[e]ach of the legal issues presented in these declaratory judgment claims is already before the Court by virtue of Trilogy's causes of action, Defendants' substantive claims, and Defendants' affirmative defenses."  Pl.'s Mem. at 38.  Defendants retort that their declaratory judgment claims should not be dismissed because they will ensure "certainty and finality to the disputes between the parties," which Trilogy may try to evade with its "shifting sands approach to the scope of this litigation."  Defs.' Opp'n at 38.  Doubling-down on this critique of Trilogy's litigation strategy, defendants state that "Trilogy's initial complaint in this case only pled Kila Thomas as an alleged source of Trilogy's alleged trade secrets information," but its amended complaint also identifies GDIT as a potential source.  *Id.* at 38-39.

Where requests for declaratory relief simply "bring[] into question issues that have already been presented in plaintiff's complaint and defendant's answer to the original claim, courts often exercise their discretion to dismiss the [redundant] counterclaim." *Boone v. MountainMade Found.*, 684 F. Supp. 2d 1, 12 (D.D.C. 2010) (quoting *Waller v. DB3 Holdings, Inc.*, No. 7-cv-0491, 2008 WL 373155, at *3 (N.D. Tex. Feb. 12, 2008)). Given that redundancy, there is no "useful purpose to be achieved in deciding" the declaratory judgment claim. *Id.* (quoting *Pub. Serv. Comm'n of Utah v. Wycoff, Co., Inc.*, 344 U.S. 237, 240 (1952)).

Here, defendants have provided no justifiable basis for retaining their declaratory judgment claims. Defendants point to no non-duplicative claim after Trilogy amended its complaint, and their references to concerns about finality are incomprehensibly vague. Those redundant declaratory judgment claims will therefore be dismissed. *See, e.g.*, *Boone*, 684 F. Supp. 2d at 12; *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 31 (D.D.C. 2017) (dismissing declaratory judgment claims that are "duplicative of those addressed by the breach of contract claims and would therefore not serve a useful purpose").

## I.    Trilogy Request for Dismissal With Prejudice

Trilogy requests not only that defendants' claims be dismissed in full but that they be dismissed with prejudice. Pl.'s Mem. at 40. Relying on its argument that defendants' claims and counterclaims rest on alleged statements protected by the First Amendment, Trilogy contends that "[i]t would be futile to allow defendants to further amend their claims," because "the allegation of other facts consistent with the challenged pleading could not possibly cure their deficiency." *Id.* (second passage quoting *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (2015)). Defendants point out that the default in this district is that a party is given the opportunity to amend allegations, as Trilogy argued in its own previous filings in this case regarding its own claims. *See* Defs.' Opp'n at 39 (citing Trilogy's Response to SAIC &

Halfaker's Mot. to Dismiss at 27-28, ECF No. 36). Indeed, "[t]he standard for dismissing a complaint with prejudice is high," as such a dismissal "operates as a rejection of the [party's] claims on the merits and [ultimately] precludes further litigation of them." *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) (last alteration in original) (second passage quoting *Jaramillo v. Burkhart*, 59 F.3d 78, 79 (8th Cir. 1995)). Given that the statements at issue are not immunized by the First Amendment, *see supra* Part III.A, Trilogy has not demonstrated why dismissal with prejudice would be appropriate here and the request for such dismissal is denied.

## IV.    CONCLUSION

For the reasons explained, all of defendants' claims asserted in their Counterclaims and their Transferred Complaint are dismissed without prejudice.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  September 16, 2025

_____
**BERYL A. HOWELL**
United States District Judge